# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARMEN J. MAURELLA III, on behalf of himself, and all others similarly situated, | Case No. 1:18-cv-07435 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| H&R BLOCK, INC., and H&R BLOCK TAX SERVICES LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page(s)**

I.      SUMMARY OF THE ACTION ................................................................... 1

II.     JURISDICTION AND VENUE ................................................................. 3

III.    THE PARTIES ............................................................................................ 4

IV.     FACTUAL ALLEGATIONS ...................................................................... 6

    A.    Trade and Commerce ...................................................................... 6

    B.    The H&R Block Franchise ............................................................. 6

        a.    H&R Block's Franchise Model ............................................ 7

        b.    H&R Block's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of H&R Block Franchise Offices ................................................................................... 9

    C.    The No-Poach Agreements between and among Competing H&R Block Locations Owned by Defendants and by Franchisees ...................... 10

    D.    Employee Recruitment, Hiring, and Training ................................. 12

        a.    Required Training Specific to Employment at H&R Block and Its Franchises ................................................................ 14

        b.    The H&R Block System ...................................................... 17

    E.    The Purpose and Effect of the Conspiracy was to Restrict Mobility and Suppress Compensation for Employees with H&R Block-Specific Training ......................................................................... 18

        a.    Restricted and Reduced Mobility ....................................... 18

        b.    Suppressed Compensation .................................................. 20

    F.    Illegality and Anticompetitive Harm of Franchise No-Poach Agreements ................................................................................... 21

V.      CO-CONSPIRATORS AND AGENTS ..................................................... 22

VI.     CLASS ACTION ALLEGATIONS ........................................................... 23

VII.    ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION ...................................................................................... 25

VIII.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS ................ 27

IX.    CLAIM FOR RELIEF ................................................................................................ 28

X.    DEMAND FOR JURY TRIAL ................................................................................. 29

XI.    PRAYER FOR RELIEF .......................................................................................... 30

Plaintiff Carmen J. Maurella III brings this action under the antitrust laws of the United States on behalf of himself and a class of all others similarly situated (the "Class," defined below), against Defendants H&R Block, Inc., and H&R Block Tax Services LLC (together, "H&R Block") based on Defendants' and unnamed co-conspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation. All allegations are upon information and belief based upon the investigation of counsel, other than those concerning Plaintiff personally.

Plaintiff brings this action to recover damages, including treble damages and other appropriate relief, and further alleges as follows:

## I.      SUMMARY OF THE ACTION

1.      This is an antitrust class action brought by and on behalf of individuals who work or have worked for Defendants, a tax preparation services company and franchisor.

2.      Defendant H&R Block, Inc., is the "largest consumer tax services provider" in the United States and provides tax preparation and assistance services at physical offices, online, and via desktop and mobile applications. Defendants provide in-person tax preparation services at approximately 10,000 offices in the United States. As of 2018, approximately one-third are franchise locations, while approximately 6,700 U.S. offices are corporate-owned.

3.      Tax preparation personnel, like personnel in any labor market, benefit when their employers compete for their services. Competition in the labor market

creates leverage for personnel, which in turn leads to higher wages and greater mobility.

4.     Beginning at least by January 2009, the exact date currently unknown to Plaintiffs, and continuing until at least May 2018, Defendants, along with other unnamed persons and entities acting as co-conspirators, engaged in a conspiracy with respect to the recruiting of employees and potential employees, including but not limited to agreements not to solicit or recruit without prior approval each other's personnel (the "Conspiracy"). Defendants formed, entered into, carried out, and enforced the anti-competitive contract, combination, or conspiracy described herein. Defendants orchestrated, dispersed, and enforced the agreement among themselves and all franchisees, including at least in part through an explicit contractual prohibition ("No-Poach Clause") contained in standard H&R Block franchise agreements. The Conspiracy, which is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, limited Plaintiff's and Class members' job mobility and suppressed their compensation below the levels that would have been available absent the Conspiracy.

5.     The standard H&R Block franchise license agreement entered into by H&R Block and franchisees during the Class Period includes a "Restrictions on Competition" clause, which provides that "During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent . . . . Solicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block."

6.     The Conspiracy involved both H&R Block itself as well as its franchisees. Instead of a one-way agreement by franchisees to not solicit or recruit employees from either other franchisees or from H&R Block's company-owned stores, H&R Block itself adhered to the same agreement in the operation of its company-owned stores.

7.     The purpose and effect of the restraint was to limit and suppress mobility and compensation for class members, including those who did not try – and failed – to be recruited or hired by another H&R Block corporate or franchise location.

8.     These agreements impeded or restricted the movement of employees between H&R Block and its franchisees. These agreements also prohibited and prevented competition between and among H&R Block and its franchisees for employees. The agreements unreasonably limited franchisees' ability to solicit employees who work for H&R Block or other franchisees, reducing the pool of experienced candidates available to them, and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages, especially if the lost opportunities were superior to their current employment.

## II.     JURISDICTION AND VENUE

9.     Plaintiff Carmen J. Maurella III brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

11. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transacts business in this District.

12. Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Illinois. In particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

13. Plaintiff Carmen J. Maurella III resides in this district and worked for H&R Block or its franchisee in this district.

### III.    THE PARTIES

14. Plaintiff Carmen J. Maurella III is an individual residing in Homer Glen, Illinois. During the Class Period, Mr. Maurella worked as a tax preparer for Defendant

4

H&R Block in Lisle, Illinois. As a result of the Conspiracy, Mr. Maurella's compensation was suppressed during the time he worked for Defendant.

15.     Defendant H&R Block, Inc., is a Missouri corporation with headquarters at One H&R Block Way in Kansas City, Missouri. H&R Block, Inc., is a leading tax preparation and assistance company which provides services in-person, online, and through desktop and mobile application software. H&R Block, Inc., holds several wholly owned subsidiaries in the United States.

16.     Defendant H&R Block Tax Services LLC is a Missouri limited liability company and a wholly-owned subsidiary of Defendant H&R Block, Inc. It is also headquartered at One H&R Block Way in Kansas City, Missouri.

17.     Defendant H&R Block, Inc., and Defendant H&R Block Tax Services LLC, together, are referred to herein as H&R Block.

18.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit and the identities of which are presently unknown, including H&R Block franchisees as well as direct and indirect subsidiaries of Defendant H&R Block, Inc., that operate company-owned stores, have participated as co-conspirators with the defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities at a later date.

19.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the

corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV. FACTUAL ALLEGATIONS

### A. Trade and Commerce

20.     Throughout the Class Period (as defined below), Defendants and co-conspirators employed Class members throughout the United States, including in this District.

21.     Defendants' conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

### B. The H&R Block Franchise

22.     H&R Block was founded in 1955 in Kansas City, Missouri and quickly expanded to New York City. Later, the New York City offices were sold to the first H&R Block franchisees.

23.     H&R Block rapidly expanded through the franchise model. Within five years of its first franchise agreements, H&R Block had opened up 200 more offices. Then, during the 1970s, its business expanded to more than 8,600 offices across the United States.

24.     Today, H&R Block has approximately 10,000 office locations in the United States, with approximately 6,700 corporate-owned offices and 3,300 franchise

offices. There are both corporate-owned and franchise locations in virtually every state and the District of Columbia.

25. Defendant H&R Block, Inc., the parent holding company, has partially diversified its business since the 1960s, but tax preparation services remain the company's core business. Many of H&R Block, Inc.'s non-tax preparation affiliates provide ancillary services such as financing to franchisees or customers.

26. In fiscal year 2018, H&R Block, Inc., has reported over $3.1 billion in annual revenues.

27. As it reported in 2018, H&R Block, Inc.'s major revenue sources include fees earned for tax preparation and related services performed at corporate-owned tax offices, royalties from franchisees, fees for online tax preparation services, sales of desktop tax preparation software, and fees from related services and products.

### a. H&R Block's Franchise Model

28. H&R Block franchises throughout the United States operate on standardized terms pursuant to a common franchise license agreement. They are competitors with H&R Block and with each other.

29. H&R Block franchise offices operate as independent companies and separate economic entities from H&R Block.

30. H&R Block franchisees are independent contractors. Such franchisees independently own and operate their businesses. As stated in H&R Block's standard franchise agreement, H&R Block franchisees function in an "independent contractor" relationship with H&R Block Defendants.

31.     That franchise agreement further states that such franchisees are not "a joint venturer, joint employer, partner, agent, fiduciary, or employee" of H&R Block Defendants. In fact, the franchise agreement prohibits franchisees from holding themselves out as such, except when expressly authorized by H&R Block Defendants.

32.     The franchise agreement further spells out that, as to the franchisee and H&R Block Defendants, "neither party will have any power to bind or obligate the other; and neither party will be liable to any person for any debts or liabilities incurred by the other."

33.     Within this framework, the H&R Block Franchise Disclosure Document ("FDD"), which summarizes and explains its standard franchise license agreement and practices, expressly states on page 1 that H&R Block, including its corporate-owned locations, and its franchisees are competitors: "[The franchisee's] direct competition from national and local tax return tax preparation firms will include [H&R Block] affiliates."

34.     H&R Block's FDD further states that its franchisees are competitors both (1) with its other franchisees and (2) with H&R Block's corporate-owned offices. The FDD provides that franchisees are to operate within a defined Franchise Territory, but do "not, however, receive an exclusive Franchise Territory." On the contrary, as H&R Block's Franchise Disclosure Document clarifies, franchisees may "face competition from other offices that [H&R Block] franchise[s] or own[s], or that are franchised or owned by [H&R Block's] parent or affiliates, or from other channels of distribution or competitive brands [H&R Block] control[s]."

35.     Additionally, the Franchise Disclosure Document provides that H&R Block or its affiliates may provide the same products and services as the franchisee in the Franchise Territory under a different mark within the Franchise Territory, "regardless of proximity to or economic impact upon [the] Franchised Business."

### b.   H&R Block's Independent Franchisees Exercise Sole and Complete Decision-Making Authority as to All Employment-Related Decisions of H&R Block Franchise Offices

36.     H&R Block on the one hand, and the franchisees on the other, purport to make separate and independent decisions.

37.     H&R Block's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of H&R Block Defendants:

> All employees hired by or working for Franchisee will be solely the employees of Franchisee and not employees of H&R Block or subject to H&R Block's control. Specifically, Franchisee will have exclusive control over all employment related decisions, including decisions concerning hiring, firing, wages, conditions of employment, discipline, staffing, or any other day-to-day management of employees. H&R Block has no obligation or right to control any franchise employment issue.

38.     Thus, as H&R Block's standard franchise agreement and FDD makes clear, H&R Block franchise locations do and are intended to compete with each other as well as with H&R Block corporate-owned locations. Each franchisee independently owns and operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all

9

employment-related decisions, including but not limited to recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline and other day-to-day management of employees.

39. But for the Conspiracy, and the conduct of Defendants and their agents and co-conspirators in furtherance thereof, each H&R Block franchisee would have been free to make its own market decisions relating to recruitment, hiring, firing, advancement, promotion, staffing, wages, conditions of employment, discipline, and other day-to-day management of employees.

40. But for the Conspiracy, and the conduct of Defendants and their agents and co-conspirators in furtherance thereof, each H&R Block franchisee would have competed with other H&R Block franchisees and with H&R Block corporate-owned locations for employees and would have engaged in competition and would have solicited and recruited employees from other H&R Block franchisees and from H&R Block corporate-owned locations.

## C. The No-Poach Agreements between and among Competing H&R Block Locations Owned by Defendants and by Franchisees

41. Notwithstanding the franchise license agreement's definition of the franchisor-franchisee relationship, H&R Block and its franchises have agreed not to compete with respect to recruitment and other aspects of competition with respect to the soliciting and recruiting of employees.

42. As alleged herein the Conspiracy, including the anticompetitive No-Poach agreement, was between and among separate economic actors pursuing separate

economic interests such that the agreement deprives the marketplace generally and the class members in particular of the benefits of independent centers of decision making as well as the benefits of free and open competition.

43.     Until in or about May 2018, H&R Block and its franchisees entered into express contractual agreements forbidding competition for employees among franchisees and H&R Block's corporate-owned tax offices. In particular, the standard language in H&R Block's franchise agreements with all franchisees who executed franchise agreements during the Class Period includes an express No-Poach provision that prohibits franchisees from soliciting or recruiting employees of other H&R Block franchisees or of H&R Block or its subsidiaries.

44.     The relevant provision from the standard H&R Block franchise license agreement during the Class Period provided: "During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent

. . . . [s]olicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block."

45.     The No-Poach restriction was not intended or limited to simply protecting H&R Block's investment in training its employees at corporate-owned offices. After all, the franchise offices' employees were required to meet the same training requirements.

46.     The restriction placed on franchisees from poaching **employees from other franchisees** further underscores the true purpose and value of the No-Poach

Clause and surrounding policies to H&R Block: restricting competition for employees in the market and artificially suppressing wages among competing firms in a highly specialized sector.

47.     While the No-Poach Clause in the standard franchise license agreement ostensibly placed an obligation only upon franchisees, H&R Block operated under the same policy to effectuate and enforce the Conspiracy.

48.     Enforcing the Conspiracy was a central part of the recruiting and hiring process at H&R Block's corporate-owned stores. For example, the first question on H&R Block's online application for its corporate tax offices asks, "Have you ever worked for H&R Block or a H&R Block Franchise affiliate?" If yes, applicants are prompted to input their H&R Block Employee ID. This question is separate and apart from and precedes the history of employment portion on the application. This allows the prospective H&R Block employer to easily flag applicants who are or have been employed by competing H&R Block franchisees or H&R Block corporate stores. The purpose and effect of this provision is to enforce and perpetuate the Conspiracy, in particular, by identifying and preventing violations of the agreement.

**D.     Employee Recruitment, Hiring, and Training**

49.     As one of the largest providers of tax preparation services in the United States, H&R Block has a critical need for workers trained not only in tax preparation and assistance but also in H&R Block's System. The same is true for H&R Block franchisees.

50.     At the height of the 2018 tax season, H&R Block employed over 90,000 individuals, including tax professionals and other administrative staff. Franchise locations employ an estimated additional 20,000 to 30,000 employees, many of whom are seasonal.

51.     Due to the seasonal nature of tax preparation and related services, H&R Block and its franchisees must recruit and hire a large number of new or returning employees every year. As H&R Block highlights in its 2018 Form 10-K disclosure to the Securities and Exchange Commission, H&R Block's "business is dependent on the availability of a seasonal workforce, including tax professionals, and [its] ability to hire, train, and supervise these employees."

52.     H&R Block's 10-K further underscores the importance of recruiting and hiring large numbers of qualified tax preparers each tax season due to the "specialized and highly seasonal nature" of the tax preparation business, that "presents financial risks and operational challenges, which, if not satisfactorily addressed, could materially affect our business and our consolidated financial position, results of operations, and cash flows."

53.     In particular, H&R Block states that, "[s]uccess in [the] industry depends on our ability to attract, develop, motivate, and retain key personnel in a timely manner, including . . . those in seasonal tax preparation positions or with other required specialized expertise, including technical positions. The market for such personnel is extremely competitive, and there can be no assurance that we will be successful in our efforts to attract and retain the required personnel."

13

54. As H&R Block recognized in its Form 10-K filing, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between H&R Block, its franchise locations, and other companies providing tax preparation services, and thus, higher wages, benefits, compensation and other terms of employment. Instead, as part of its efforts to "satisfactorily address[]" the threats to cash flow associated with the seasonal turnover of employees in an "extremely competitive" market, H&R Block conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation and other terms of employment.

### a. Required Training Specific to Employment at H&R Block and Its Franchises

55. Each H&R Block tax professional must invest hundreds of dollars and dozens of hours to complete H&R Block-specific educational requirements before even being considered for employment at H&R Block or its franchises, unless he or she passes a test to demonstrate equivalent knowledge. Moreover, completion of those requirements provides no guarantee of employment. Further, tax preparers seeking to work in subsequent tax seasons after being hired by and working at H&R Block and its franchises must complete at least 18 hours of additional H&R Block-specific training before being considered for re-hire.

56. To meet the need for the large number of tax professionals required to staff the company's many corporate and franchise office locations, H&R Block

established "H&R Block Income Tax Schools" as early as 1978 to provide introductory income tax courses to individuals with no background in tax return services as well as supplemental courses for more experienced tax professionals. Today, the introductory Income Tax Course provides 60 to 89 hours of instruction relating to tax forms. Classes are typically held at local H&R Block offices—both corporate-owned and franchise locations—with additional sessions provided online. Students must pay for course materials.

57.     In order to apply for a job with H&R Block or an H&R Block franchise, a prospective employee must either take the 60-hour Income Tax Course or pass a test to demonstrate equivalent knowledge. A high school diploma is not a prerequisite for enrolling in the Income Tax Course or taking the knowledge exam.

58.     The course requirement is not considered training, as H&R Block will not even consider an application until a prospective employee fulfills the course requirement or passes an equivalent knowledge test. Rather, completion of the course is a prerequisite to being considered for employment.

59.     Instead, H&R Block's marketing materials advertise that the basic Income Tax Course helps individuals master their own annual returns and "can also lead to a job." Fine print makes clear that completion of the course does not guarantee employment at H&R Block.

60.     H&R Block's marketing materials further clarify that the course "is not intended for, nor open to any persons who are either currently employed or seeking employment with any professional tax preparation company or organization other than

H&R Block [or one of its franchise offices]. During the course, should H&R Block learn of any student's employment or intended employment with a competing professional tax preparation company or service, H&R Block reserves the right to immediately cancel the student's enrollment."

61.     Upon successful completion, H&R Block Income Tax Course students receive an H&R Block Certification. This Certification is a prerequisite for most if not all tax preparation jobs at H&R Block corporate or franchise locations.

62.     In addition, seasonal tax preparation workers must complete at least eighteen to twenty-four hours of H&R Block training before they can be considered for rehire in a subsequent tax season.

63.     These H&R Block-specific education requirements are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

64.     The principal educational qualifications of many employees at H&R Block's corporate-owned or franchise offices, including "Senior Tax Analysts," are completion of highly specialized, H&R Block-specific trainings and certifications.

65.     With limited educational qualifications apart from hundreds of hours invested in H&R Block-specific training, many tax professionals at H&R Block's corporate-owned and franchise locations are uniquely suited to working at H&R Block or one of its franchise locations. Based on H&R Block's franchise-specific education requirements for all corporate-owned and franchise locations, employees should

generally be highly mobile between H&R Block's corporate-owned and franchise offices.

66.     In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for H&R Block-trained workers in the highly specialized and technical tax preparation services industry, particularly within the H&R Block System, would be robust and would have increased and enhanced the workers' compensation and mobility.

**b.     The H&R Block System**

67.     In addition to the specialized training discussed above required for all tax preparers, franchisees and management-level employees must complete further specialized training on the H&R Block System.

68.     H&R Block utilizes "a distinctive system" for establishing and operating tax return preparation businesses and performing related services ("System"). According to its standard Franchise Disclosure Document, the H&R Block System includes "proprietary processes, methods and software; standards, specifications and procedures for operations; procedures for management control; training and assistance; and advertising and promotional programs."

69.     Both corporate-owned and franchise offices and their employees must operate according to the H&R Block System.

70.     To ensure familiarity and compliance with the distinctive H&R Block System, franchisees and their management-level employees must attend training on the System prior to their first and second tax seasons. Under the standard franchise

17

agreement, the franchisee is responsible for the travel expenses, room, board, and wages for the training. These initial and other ongoing trainings cover topics including franchisor/franchisee commitments, personnel management and training programs, and the H&R Block service model.

71.     As a result of the H&R Block-specific training, education, and qualification requirements, including as to H&R Block proprietary processes, procedures, methods, and software, as in H&R Block Income Tax Courses and Schools, employment with a non-H&R Block tax preparation company or business is not a reasonable substitute for the employees of H&R Block and their franchises.

**E.      The Purpose and Effect of the Conspiracy was to Restrict Mobility and Suppress Compensation for Employees with H&R Block-Specific Training**

**a.      Restricted and Reduced Mobility**

72.     Defendants' Conspiracy has restricted and reduced mobility between H&R Block corporate-owned and franchise locations.

73.     The H&R Block website provides information about more than 65,000 tax professionals working at corporate-owned or franchise offices. Tax professionals with differing degrees of seniority and training carry different titles, including Master Tax Advisor, Senior Tax Analyst, Tax Analyst, Senior Tax Specialist, Tax Specialist and Tax Associate.

74.     Figure 1 below shows the approximate numbers and percentages of tax professionals employed by H&R Block's corporate and franchise locations as of in or around September 2018 by their office location association:

**Figure 1:**

| Location | Employee Count | Percentage |
|---|---|---|
| 1. Single Location (Company or Franchise) | 45,458 | 69.07 % |
| 2. Multiple Company-Owned Locations | 17,215 | 26.16 |
| 3. Multiple Locations within One Franchise Group | 2,687 | 4.08 |
| 4. Both Company-Owned and Franchises | 269 | 0.41 |
| 5. Multiple Franchise Groups | 187 | 0.28 |
| 6. **Total** | **65,816** | **100.00 %** |

75.     Nearly 70% of the 65,000 tax professionals listed on H&R Block's website are affiliated with a single corporate-owned or franchise office. An employee being associated with only one location would comply with the No-Poach Clause and the Conspiracy. Approximately 26% are listed as working at multiple corporate-owned offices, and an additional 4% are affiliated with multiple offices within one franchise group—that is, franchise locations owned by the same franchisee. These associations also would comply with the No-Poach Clause and the Conspiracy. Only 0.41%, however, are affiliated with both company-owned and franchise offices. And only 0.28% of tax professionals are affiliated with offices in more than one franchise group. Thus, approximately 99.3% of current employees at H&R Block's corporate and franchise offices appear to be in compliance with the terms of No-Poach Clause and the Conspiracy, while about 0.7% of current employees appear to be noncompliant.

76.     The small number of employees affiliated with both a corporate-owned office and a franchise office—particularly in comparison to the much larger number of employees at multiple corporate-owned locations or offices within the same franchise group—help demonstrate not only that the No-Poach Clause in the standard Franchise

19

License Agreement is routinely enforced, but also that the H&R Block corporate-owned stores adhere to a parallel rule not to solicit or recruit employees from franchisee offices. These agreements and policies eliminate incentives and abilities of franchisees and corporate-owned offices to compete for employees.

77.     The Conspiracy restricted employees' mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation and other benefits, compounded over the long term of the Conspiracy.

78.     The Conspiracy and its harmful effects were not limited to tax professionals but extended to managers, executives and other employees of Defendants.

**b.     Suppressed Compensation**

79.     H&R Block and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees at H&R Block and its franchises are paid below the national salary for similar job titles.

80.     For example, H&R Block Seasonal Tax Preparers have an average base pay of approximately $10.86 per hour, while the Bureau of Labor Statistics ("BLS") hourly mean wage for a tax preparer is $22.67 per hour. H&R Block receptionists reportedly earn approximately $9.80 per hour while the BLS hourly mean wage for receptionist is $13.65.

81.     Figure 2 below shows approximate average yearly earnings at H&R Block compared to national figures for comparable positions.

20

**Figure 2**

### H&R Block Average Salary v. National Average Salary Selected Titles

| Job Title | Average Salary | | Percent Below National Average |
|---|---|---|---|
| | H&R Block | National | |
| (1) | (2) | (3) | ((3)-(2))/(3) |
| | | | (4) |
| Senior Tax Analyst | 37,232 | 79,948 | 53% |
| Tax Analyst | 30,659 | 57,747 | 47% |
| Tax Preparer | 22,651 | 26,666 | 15% |
| Office Manager | 30,014 | 38,117 | 21% |
| Receptionist | 20,384 | 25,064 | 19% |

82.     But for the Conspiracy, employee compensation at H&R Block corporate-owned and franchise offices would be significantly higher.

**F.     Illegality and Anticompetitive Harm of Franchise No-Poach Agreements**

83.     On or about July 9, 2018, the Attorneys General of 10 states, including of Illinois, and of the District of Columbia announced an investigation into the anticompetitive hiring and recruiting practices and procedures used by several large franchise companies, and stated that:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

21

84.     Within days of the announcement of the States' investigation, H&R Block made public that it had agreed to end its practice of including and enforcing No-Poach Agreements in franchise contracts.

## V.     CO-CONSPIRATORS AND AGENTS

85.     The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

86.     Individuals and/or entities not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

87.     Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents.

88.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## VI.   CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action on behalf of himself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All tax professionals and managers who worked at any H&R Block location in the United States, whether owned and operated by H&R Block or by its franchisee, at any time between January 1, 2009, and May 10, 2018.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories. "Tax professionals" includes any and all persons who worked at any H&R Block location during the class period and whose duties included tax return processing or processing support, tax return preparation or preparation support, tax return preparation advice, operating, writing, or debugging H&R Block propriety tax return software, or who had to complete H&R Block's Income Tax School or demonstrate equivalent knowledge to qualify for his or her position at H&R Block. "Managers" includes any and all persons who worked at any H&R Block location during the class period and whose duties included supervision or management of tax professionals as defined herein.

90.     Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants or co-conspirators and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

91.    Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but, based upon the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there are at least thousands of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

92.    The questions of law or fact common to the Class include, but are not limited to:

  a.    whether the Conspiracy violated the Sherman Act;

  b.    whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

  c.    whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

  d.    whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

  e.    the type and measure of damages suffered by Plaintiff and the Class.

93.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

94.    Plaintiff's claims are typical of the claims of the Class.

95.    Plaintiff will fairly and adequately represent the interests of the Class and has no conflict with the interests of the Class.

96.     Plaintiff has retained competent counsel experienced in antitrust litigation, and specifically with respect to antitrust litigation involving agreements regarding hiring, recruiting, no-poach agreements, and class action litigation to represent himself and the Class.

97.     Defendants and the co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

98.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.     ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

99.     The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, retraining and stabilizing the compensation paid to their personnel at artificially low levels.

100.     The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also

extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

101.    While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for tax professionals and managers at H&R Block, as defined herein, in the United States.

102.    Through their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefits and other aspects of compensation and eliminate competition.

103.    The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

104.    In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

105.    In the alternative, any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to restricting employee mobility and suppressing wages, benefits and other aspects of compensation.

## VIII.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

106.     While Plaintiff had knowledge of aspects of Defendants' and industry recruiting practices, Plaintiff had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, H&R Block's public announcement that it had ended the practice of including and enforcing No-Poach Agreements in franchise contracts on or around July 12, 2018. Nor did Plaintiff have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiff that their compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiff therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

107.     Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden from those it affected most—their employees and prospective employees— Defendants and their co-conspirators did not publicize the No-Poach Clause of their franchise agreements. Defendants also did not inform employees of the Conspiracy between H&R Block and its franchises during the application process or the new employee onboarding process.

108.     Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

109. As a result of Defendants' and their co-conspirators' successful efforts to conceal the fact and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning Defendants' conspiracy.

## IX. CLAIM FOR RELIEF

### (Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3)

110. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following:

111. Beginning no later than January 1, 2009, and continuing until in or around May 2018, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

112. Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing and stabilizing the wages, benefits and other aspects of compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for labor.

113. As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

114.     The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

a.     competition among Defendants for labor has been suppressed, restrained, and eliminated; and

b.     Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

115.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

116.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

117.     Accordingly, Plaintiff and Class members are entitled to three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## X.     DEMAND FOR JURY TRIAL

118.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the Class, demands a jury trial as to all issues triable by a jury.

## XI.     PRAYER FOR RELIEF

119.     WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

a.     This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

b.     Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of this violation;

c.     The alleged combinations and Conspiracy are *per se* violations of the Sherman Act;

d.     Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.     Judgment be entered for Plaintiff and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

f.     Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.     Plaintiff and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

       h.      Plaintiff and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: November 8, 2018                */s/ Mark R. Miller*_____

                                             Kenneth A. Wexler
                                             Mark R. Miller
                                           WEXLER WALLACE LLP
                                           55 West Monroe St., Suite 3300
                                           Chicago, IL 60603
                                           Tel: (312) 346-2222
                                           kaw@wexlerwallace.com
                                           mrm@wexlerwallace.com

                                           Joseph R. Saveri (*pro hac vice* to be submitted)
                                           Steve N. Williams (*pro hac vice* to be submitted)
                                         Jiamin Chen (*pro hac vice* to be submitted)
                                           V Prentice (*pro hac vice* to be submitted)
                                           JOSEPH SAVERI LAW FIRM, INC.
                                           601 California Street, Suite 1000
                                           San Francisco, CA 94108
                                           Tel: (415) 500-6800
                                           Fax: (415) 395-9940
                                           jsaveri@saverilawfirm.com
                                           swilliams@saverilawfirm.com
                                           jchen@saverilawfirm.com
                                           vprentice@saverilawfirm.com

                                           *Attorneys for Plaintiff and the Proposed Class*