# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| CARMEN J. MAURELLA III, on behalf of himself, and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) Case No. 1-18-cv-07435 |
| v. | ) Case No. 1-18-cv-07520 ) (Consolidated Matter) |
| H&R BLOCK, INC. and H&R BLOCK TAX SERVICES LLC | ) ) Hon. Charles Norgle ) |
| Defendants. | ) ) |
| COLLEEN GRIFFITH, on behalf of herself, and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| H&R BLOCK, INC. and H&R BLOCK TAX SERVICES LLC | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF SCOTT W. ANDREASEN

I, Scott W. Andreasen, declare as follows:

      1.      I either have personal knowledge of the facts and matters set forth below or I have determined that such facts and matters are true and correct on the basis of information obtained from business records and/or information brought to my attention by individuals upon whom I regularly rely. If I were called as a witness in this matter, I could and would testify competently to each fact so set forth.

      2.      I am the Vice President and Secretary for H&R Block Tax Services LLC ("Tax Services") and affiliated entities that operate under the trade name of H&R Block ("H&R Block"). I am familiar with the H&R Block structure and operations, office and facility locations, and hiring and employment practices.

      3.      I have served in that capacity since May 21, 2012.

      4.      My office is located at One H&R Block Way, Kansas City, Missouri 64105.

      5.      Each year, seasonal employees are hired in H&R Block offices across the country that provide tax preparation and related services to clients under the H&R Block name. The majority of these services are provided during the tax season, which generally runs from December until on or around April 15th of the following year. The services provided to clients include assisting clients with their personal and corporate income tax returns on both the federal and state level, including, in some instances, across multiple states.

**Motion to Compel Arbitration**

      6.      Plaintiff Carmen Maurella III ("Maurella") worked as a seasonal employee in an H&R Block office in Illinois during various times between 2014 and 2016. Prior to each term of seasonal employment, Maurella signed an agreement containing a mutual arbitration agreement in which he agreed to resolve any and all claims or disputes with H&R Block companies through

binding arbitration.  True and correct copies of the contracts containing these arbitration agreements are attached hereto as Exhibits A-C.

7.      Plaintiff Colleen Rebecca Griffith (formerly Colleen Rebecca Stowe) ("Griffith") worked as a seasonal employee in an H&R Block office in Pennsylvania during various times between 2003 and 2016.  Griffith signed agreements containing a mutual arbitration agreement beginning in 2011 in which she agreed to resolve any and all claims or disputes with H&R Block companies through binding arbitration.  True and correct copies of the contracts containing these arbitration agreements are attached hereto as Exhibits D-I.

8.      The terms of each Plaintiff's arbitration agreements are the same or substantially similar.  Plaintiffs' arbitration agreements contain the following provisions (among others):

a.      **Governing Law –** Plaintiffs' arbitration agreements provide that they are governed by the Federal Arbitration Act.  *See* Exhibits A § 17(a); B § 14(a); C § 17(a); D § 19(a); E § 19(a); F § 18(a); G § 17(a); H § 1; I § 17(a).  For example, the most recent arbitration agreement for each Plaintiff provides that the "Arbitration Agreement will be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.) . . . ." Exhibits C § 17(a) (Maurella); I § 17(a) (Griffith).

b.      **Scope of Arbitration –** Plaintiffs' arbitration agreements provide that "any and all" claims or disputes between Plaintiffs and the H&R Block companies will be resolved in arbitration.  *See* Exhibits A § 17(a)-(b); B § 14(a)-(b); C § 17(a)-(b); D § 19(a)-(b); E § 19(a)-(b); F § 18(a)-(b)l; G § 17(a)-(b); H §§ 1-2; I § 17(a)-(b).  For example, the most recent arbitration agreement for each Plaintiff provides that "Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement . . . ." and "[t]his

agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company." Exhibits C § 17(a) (Maurella); I § 17(a) (Griffith). The most recent arbitration agreement for each Plaintiff further provides:

> This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. . . . Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof.

Exhibits C § 17(b) (Maurella); I § 17(b) (Griffith).

      c.     **Class Action Waiver –** Plaintiffs' arbitration agreements provide that Plaintiffs and the H&R Block companies waive the right to bring any disputes on a class-wide basis and rather agree that all disputes will be arbitrated on an individual basis. *See* Exhibits A § 17(e); B § 14(e); C § 17(e); D § 19(d); E § 19(d); F § 18(e); G § 17(e); H § 5; I § 17(e). For example, the most recent arbitration agreement for each Plaintiff provides: "THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY SUCH CLAIM ("Class Action Waiver")." Exhibits C § 17(e) (Maurella) (emphasis in original); I § 17(e) (Griffith) (emphasis in original).

      d.     **Arbitration Opt Out** – Plaintiffs' arbitration agreements contained an opt out provision which allowed Plaintiffs to opt out of arbitration within 30 days of signing the agreement. *See* Exhibits A § 17(h); B § 14(h); C § 17(h); D § 21; E § 20; F § 18(h);

4

G § 17(h); H § 8; I § 17(h).  For example, the most recent arbitration agreement for each

Plaintiff provides:

> Associate may opt-out of this Arbitration Agreement in Section 17 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 17. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 17, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

Exhibits C § 17(h) (Maurella) (emphasis in original); I at § 17(h) (Griffith) (emphasis in

original).

9.      Neither Maurella nor Griffith exercised their right to opt-out of any of their

arbitration agreements.

**Motion to Dismiss H&R Block, Inc. for Lack of Personal Jurisdiction and Venue**

10.      I am also Vice President and Secretary of Defendant H&R Block, Inc. ("Block,

Inc."), a Missouri corporation with its principal place of business located at One H&R Block

Way, Kansas City, Missouri 64105.

11.      I am a custodian of, and have access to, the records and agreements of Block, Inc.

12.      Block, Inc. is a holding company that is the ultimate parent entity to other

separate, legally-distinct entities in the H&R Block corporate family, including Defendant Tax

Services.

13.      Block, Inc. is related to its subsidiaries only in its capacity as the ultimate parent

corporation, in accordance with applicable laws, articles of incorporation, and bylaws.  Block,

Inc.'s subsidiaries maintain their own books and records and observe corporate formalities.

14.     Missouri is the only state in which Block, Inc. is authorized to transact business.

15.     Block, Inc. has not been authorized to do business, nor has it transacted business, in Illinois between January 1, 2009 and the present.

16.     Block, Inc. does not have, and did not have between January 1, 2009 and the present, offices or a mailing address in Illinois.

17.     Block, Inc. does not have, and did not have between January 1, 2009 and the present, employees in Illinois, customers in Illinois, or a registered agent for service of process located in Illinois.

18.     Block, Inc. did not employ Plaintiffs Maurella or Griffith between January 1, 2009 and the present.

19.     Block, Inc. does not have, and did not maintain between January 1, 2009 and the present, any tax offices.

20.     Block, Inc. does not, and has not between January 1, 2009 and the present, conducted the operations of any H&R Block franchised business in Illinois or elsewhere.

**Motion to Transfer Pursuant to 28 U.S.C. § 1404**

21.     Like Block, Inc., Defendant Tax Services is a Missouri corporation with its principal place of business located at One H&R Block Way, Kansas City, Missouri 64105.

22.     Relevant documents, witnesses, and information regarding the allegations in this action are located in Kansas City, Missouri, including that relating to the franchise license agreements (through which Plaintiffs allege Defendants enforced the alleged conspiracy across the country), franchise operations, and Plaintiffs' employment.

23.     Employees of the H&R Block companies, who have knowledge of the topics contained in the above paragraph and who may be called as witnesses in this matter to defend

against these lawsuits, are located in and around Kansas City, Missouri.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 28th day of February, 2019 at Kansas City, Missouri.

Scott W. Andreasen

# EXHIBIT A



# TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between **Carmen    Maurella III** of 14048 CHICORY TRAIL ,
                                 (Name)                              (Number & Street or Box No.)

**Homer Glen**     **IL**   **60491** ("Associate"), and HRB Green Resources LLC ,
    (City)          (State)    (Zip)

("the Company").  These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1.    Employment.**

The Company employs Associate as a **5000 - First Year Tax Pro** in the Company's
NAPERVILLE, IL District, Admin. ID# 12519 , for the period and upon the terms and conditions herein contained.  Associate hereby accepts such employment and agrees to comply with such terms and conditions.

**2.    Term.**

The term of this Agreement begins on the earlier of the following dates:  the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2014.  The term of this Agreement shall end on April 16, 2015.

**3.    Duties.**

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block, Inc. Code of Business Ethics & Conduct.  Associate acknowledges that it is outside the scope of Associate's employment hereunder and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

**4.    Compensation.**

The Company shall pay Associate an hourly rate of pay, the amount of which shall be determined by the Company labor code assigned to a specific project or task.  Different projects or tasks are assigned different pay rates and the Company reserves the right to revise such rates at any time.  Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage.  Associate shall be paid for all hours worked, including overtime, in accordance with federal and applicable state wage and hour laws.

**5.    Withholdings and Offsets.**

The Company shall withhold from all compensation payable to Associate all required federal, state, and local taxes.  Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

**6.    Hours.**

Associate's hours of employment will be as from time to time designated by the Company.  Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs.  Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment.  Associate agrees to be available to work until the end date of this Agreement.  Associate hereby expressly acknowledges and agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7.    Termination.**

    a)    Notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

    b)    Furthermore, the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for such termination. For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

        (1)    Associate's unsatisfactory performance as determined by the Company;

        (2)    Associate's misconduct that interferes with or prejudices the proper conduct of the Company's business or which may reasonably result in harm to the reputation of the Company;

        (3)    Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to,  the H&R Block, Inc. Code of Business Ethics & Conduct;

(4) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

(5) Associate's failure to meet the criteria for any Company-mandated background check;

(6) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

(7) Associate's misrepresentation on the employment application or in this Agreement; or

(8) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c) "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block, Inc. Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

## 8. Confidential Information.

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (hereinafter together referred to as "H&R Block") the confidential nature of all such information is hereby acknowledged by Associate. In consideration for the Company providing such access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement. Associate agrees and acknowledges as follows:

a) Without the Company's prior written authorization, Associate shall not directly or indirectly: (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder. Nothing in this Section 8 shall be construed as limiting or impeding an associate covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act. Further, nothing herein shall be construed to prohibit the reporting of a violation of law or to prohibit a disclosure of information that is compelled by law; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b) Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c) "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, private or sensitive employee information (such as social security information or birth dates, and information obtained from any confidential human resources or employee files/records to which Associate may have access), and H&R Block's tax preparation software. "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use. Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.

d) The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law. Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret. Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.

e) Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f) Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g) The restrictions in this Agreement shall supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9. Extent of Services.

Associate agrees that during the term of Associate's employment Associate shall not directly or indirectly:

a) Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b) Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed

through the Company in accordance with Company policies and procedures as returns prepared by the Company. Associate may prepare and electronically file Associate's own tax return free of charge.

Associate shall not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

**10. Post-Termination Covenants.**

a) Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1) Provide any of the following services to any Company Client: (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2) Solicit Company Clients for the purpose of offering to such clients: (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b) Associate agrees that the Restricted Period for each of the above covenants shall be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c) For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d) For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e) In the event a duly appointed arbitrator (or where permitted under Section 17, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f) Associate shall not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g) Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h) Section 10(b) is not applicable to associates employed in the states of Georgia or Wisconsin.

i) For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) shall be one (1) year following the cessation of Associate's employment.

j) For Associates employed in the State of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties of adjacent states), as identified in Attachment A to this Agreement; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Sections 10(a)(1) and (2) in accordance with their terms in states outside of Louisiana.

**11. Nonsolicitation of Employees.**

a) Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company.

b) For purposes of this Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement. Where required by applicable law to be enforceable, the foregoing restriction shall only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

c) Section 11(a) is not applicable to associates employed in the state of Wisconsin. Associates employed in Wisconsin covenant that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit Company Employees to terminate their employment with the Company.

**12. Remedies.**

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage. The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity. Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief. In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11. Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement. Further, Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below. Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss. Associate agrees that this liquidated damages provision shall not

be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate shall pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season shall be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 shall otherwise be resolved in accordance with the arbitration agreement in Section 17, unless Associate opts out in accordance with Section 17(h).

### 13. Agreement Regarding Products and Services of H&R Block, H&R Block Bank, and BofI Federal Bank.

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credit, H&R Block Emerald Savings®, H&R Block Emerald Prepaid MasterCard®, Refund Anticipation Checks, credit cards, and other H&R Block-branded bank products and services and in offering other financial products and services of any other financial institution with which H&R Block partners to offer these products and services.  Associate will comply with all H&R Block and BofI Federal Bank Operating Policies and Procedures and required training related to the above products prior to conducting any facilitation marketing, solicitation, customer service or credit service organization activities.  Associate acknowledges that H&R Block Bank, BofI Federal Bank, and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services.  Associate acknowledges that the primary federal regulator of H&R Block Bank and BofI Federal Bank (the Office of the Comptroller of the Currency) and H&R Block's primary regulator for banking purposes (the Federal Reserve) have the authority to regulate, examine, and take enforcement action against the Company, its affiliates, H&R Block Bank, and BofI Federal Bank with respect to the activities performed in connection with H&R Block Bank's and BofI Federal Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators may have the authority to regulate, examine, and take enforcement action against  the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

### 14. Tax Preparer Penalties.

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate.  Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties.  Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

### 15. Representations of Associate.

a)    Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement.  Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b)    Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c)    Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties hereunder.

### 16. Enforcement.

Associate agrees that the Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

### 17. Mutual Arbitration Agreement.

a)    <u>Binding Mutual Arbitration</u>.  This Mutual Arbitration Agreement in Section 17 ("Arbitration Agreement") is between Associate and the Company.  Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 17(h) below. Any reference to the Company in this Section 17 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation any H&R Block business entity for which Associate applied for employment and/or was employed.  This Arbitration Agreement shall be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce.  This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. All Covered Claims shall be decided by an arbitrator through individual arbitration and not by way of court or jury trial.

b)    <u>Covered Claims</u>.  This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act

("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Arbitration Agreement or any portion of the Arbitration Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Arbitration Agreement or any portion of the Arbitration Agreement is void or voidable, with the exception noted in Section 17(e) below.

c)   Excluded Claims.  The following claims and disputes are not subject to arbitration  under this Arbitration Agreement:  (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v)  disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes.  Regardless of any other terms of this Arbitration Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Arbitration Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency.

d)   Further Exclusion.  This Arbitration Agreement does not apply to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate  is already  a member or potential member of the class, collective, or representative action ("Pending Claims").  This Arbitration Agreement does, however, apply to any Pending Claims that were filed against the Company before Associate was ever employed with the Company. Additionally, if Associate previously signed (and did not opt out of) an agreement to arbitrate claims with the Company prior to commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate opts out pursuant to Section 17(h) below.

e)   Class and Representative Action Waiver.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION ("Class Action Waiver").  Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver").  However, this Representative Action Waiver may be severed if it would otherwise render this Arbitration Agreement unenforceable in any action brought under a private attorneys general law, and following severance the representative action must be brought in a court of law and not in arbitration.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator.

f)   Selection and Rules.  The parties shall select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement. If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Arbitration Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".)  To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Arbitation Agreement shall govern.  Unless the parties jointly agree otherwise, the Arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator").  Unless the parties jointly agree otherwise, the arbitration shall take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator shall be selected as follows:  The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains.  That person shall be designated as the Arbitrator.  If for any reason, that person cannot serve, the selected organization shall issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

g) <u>Remedies.</u> Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company shall be responsible for all arbitration filing fees, forum fees, and fees of the arbitrator.

h) <u>Arbitration Opt-Out.</u> Associate may opt-out of this Arbitration Agreement in Section 17 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 17. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 17, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

**18. Severability.**

Except as set forth in Section 17, above, the provisions of this Agreement shall be severable. If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof. If the Class or Representative Action Waiver set forth in Section 17(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**19. Survival; Assignability.**

The parties agree that the covenants and agreements contained in Sections 8 through 21, including the Arbitration Agreement in Section 17, shall survive the termination of this Agreement and/or the termination of Associate's employment and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title, and/or the expiration of any benefit. This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

**20. Notices.**

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 17(h). Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**21. Entire Agreement.**

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 17, by a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 17 and Arbitration Opt-Out in Section 17(h). THIS EMPLOYMENT AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.** Checking the button will serve as your electronic signature. Once you have checked that button, a signature date will display in this document, below.

/s/ _____            /s/ HRB Green Resources LLC            Date Signed: 11/25/2014
Associate                          Company

# EXHIBIT B

 **H&R BLOCK**

## INSTRUCTOR EMPLOYMENT AGREEMENT

This Agreement is made between ___Carmen____Maurella III___ of ___14048 CHICORY TRAIL___,
(Name) (Number & Street or Box No.)
___Homer Glen___, ___IL___ ___60491___ ("Associate"), and ___HRB Resources LLC___,
(City) (State) (Zip ) 

("the Company"). These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1. Employment.**

The Company employs Associate in an administrative capacity as an Instructor, subject to the direction and control of the Company and subject further to Associate's compliance with the Company's policies and procedures as amended from time to time, to teach the course or courses (the "Course(s)") as assigned by the Company.

**2. Term.**

Unless terminated sooner as hereinafter provided, this Agreement shall terminate on April 30, 2016.

**3. Duties**.

Associate's duties consist of teaching the Course(s), attending required instructor training, adequately preparing for each session of the Course(s), taking attendance of all students and entering into appropriate system; administering quizzes, mid-terms, and exams when appropriate; collecting applicable tuition; maintaining cleanliness of office and integrity as a professional instructor and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block Code of Business Ethics & Conduct.

**4. Compensation.**

The Company shall pay Associate an hourly rate of pay, the amount of which shall be determined by the Company labor code assigned to a specific project or task. Different projects or tasks are assigned different pay rates and the Company reserves the right to revise such rates at any time. Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage. Associate shall be paid for all hours worked, including overtime, in accordance with federal and applicable state wage and hour laws.

**5. Withholdings and Offsets.**

The Company shall withhold from all compensation payable to Associate all required federal, state, and local taxes. Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

**6. Hours.**

Associate's hours of employment will be as from time to time designated by the Company. Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment. Associate hereby expressly acknowledges and agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

a) For the first time Associate teaches the Course in FY16, Associate shall spend no more than 45 minutes of outside-of-class preparation or communication time for each hour of in-class time. For any subsequent times Associate teaches the Course in FY16, Associate shall spend no more than one (1) hour of outside of class preparation or communication time for every three (3) hours of in-class time.

b) Associate is not expected to give homework, quizzes, or examinations that require grading outside of classroom time and shall not grade outside of classroom time any homework, quizzes or examinations given.

c) Working hours in excess of the limitations set forth in Section 6(a) is grounds for disciplinary action, up to and including termination of this Agreement and Associate's employment hereunder.

**7. Termination.**

a) Notwithstanding the above-described term, either party may terminate this Agreement upon fifteen (15) days written notice.

b) Furthermore, the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for such termination. For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

1) Associate's unsatisfactory performance as determined by the Company;

2) Associate's misconduct that interferes with or prejudices the proper conduct of the Company's business or which may reasonably result in harm to the reputation of the Company;

3) Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to, the H&R Block Code of Business Ethics & Conduct;

4) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

5) Associate's failure to meet the criteria for any Company-mandated background check;

6) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law); or

7) Associate's misrepresentation on the employment application or in this Agreement.

c) "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

## 8. Confidential Information.

Associate shall be trained in the Company's methods of operation, shall be given the opportunity to interact with students enrolled in the Course(s) and/or Company associates, and shall be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (hereinafter together referred to as "H&R Block"), the confidential nature of all such information is hereby acknowledged by Associate. Associate acknowledges that the disclosure of such Confidential Business Information could substantially injure H&R Block's present and planned business. In consideration for the Company providing Associate with access to the aforementioned training, opportunities and Confidential Business Information, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, and 10 of this Agreement. Associate agrees and acknowledges as follows:

a) Without the Company's prior written authorization, Associate shall not directly or indirectly: (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder. Nothing in this Section 8 shall be construed as limiting or impeding an associate covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act. Further, nothing herein shall be construed to prohibit the reporting of a violation of law or to prohibit a disclosure of information that is compelled by law; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b) Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block. Associate acknowledges that the Instructor Manual is the sole property of H&R Block.

c) "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's student lists, client lists, information pertaining to H&R Block's clients, private or sensitive employee information (such as social security information or birth dates, and information obtained from any confidential human resources or employee files/records to which Associate may have access), H&R Block's business development, marketing plans, product information, business and financial information and plans, tax preparation software and strategies. "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use. Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.

d) The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law. Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret. Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.

e) Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f)   Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g)   The restrictions in this Agreement shall supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9.  Non-competition.

Associate agrees that during the term of this Agreement, Associate shall not establish or engage in or be employed by (as an employee or contractor) any business or organization other than H&R Block that engages in the preparation or electronic filing of tax returns.

## 10. Non-solicitation.

Associate agrees that during the term of this Agreement and for one (1) year following the voluntary or involuntary termination of this Agreement (the "Restricted Period"), Associate shall not directly or indirectly solicit or encourage any student enrolled in the Course at any time during the term of the Course to seek employment with any business or organization, other than H&R Block, that engages in the preparation or electronic filing of tax returns.  Associate further agrees that during the Restricted Period, Associate shall not hire any student enrolled in the Course to work in any business or organization other than H&R Block that engages in the preparation filing of tax returns.

## 11. Remedies.

Associate and the Company agree that if any provision of Section 8, 9, or 10 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage.  The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity.  Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief.  In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, or 10.  Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, or 10 of this Agreement.

Any violation of Section 8, 9, or 10 shall otherwise be resolved in accordance with the arbitration agreement in Section 14, unless Associate opts out in accordance with Section 14(h).

## 12. Representations of Associate.

a)   Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement.  Associate further represents that Associate has not applied for or been accepted as an Electronic Filer other than by virtue of an application made through or on behalf of the Company.

b)   Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c)   Associate represents that Associate is not subject to any contract that would prohibit Associate from performing his/her duties hereunder.

## 13. Enforcement.

Associate agrees that Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

## 14. Mutual Arbitration Agreement.

a)   Binding Mutual Arbitration.  This Mutual Arbitration Agreement in Section 14 ("Arbitration Agreement") is between Associate and the Company.  Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 14(h) below. Any reference to the Company in this Section 14 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation any H&R Block business entity for which Associate applied for employment and/or was employed.  This Arbitration Agreement shall be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce.  This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. All Covered Claims shall be decided by an arbitrator through individual arbitration and not by way of court or jury trial.

b)   Covered Claims.  This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims,

wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Arbitration Agreement or any portion of the Arbitration Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Arbitration Agreement or any portion of the Arbitration Agreement is void or voidable, with the exception noted in Section 14(e) below.

c)   Excluded Claims.   The following claims and disputes are not subject to arbitration  under this Arbitration Agreement:   (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v)  disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes.  Regardless of any other terms of this Arbitration Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate.  Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Arbitration Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency.

d)   Further Exclusion.   This Arbitration Agreement does not apply to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate  is already  a member or potential member of the class, collective, or representative action ("Pending Claims").  This Arbitration Agreement does, however, apply to any Pending Claims that were filed against the Company before Associate was ever employed with the Company.  Additionally, if Associate previously signed (and did not opt out of) an agreement to arbitrate claims with the Company prior to commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate opts out pursuant to Section 14(h) below.

e)   Class and Representative Action Waiver.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION ("Class Action Waiver").  Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver").  However, this Representative Action Waiver may be severed if it would otherwise render this Arbitration Agreement unenforceable in any action brought under a private attorneys general law, and following severance the representative action must be brought in a court of law and not in arbitration.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator.

f)   Selection and Rules.   The parties shall select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement. If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Arbitration Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".)  To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Arbitation Agreement shall govern.  Unless the parties jointly agree otherwise, the Arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator").  Unless the parties jointly agree otherwise, the arbitration shall take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator shall be selected as follows:  The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined

by a coin toss, until only one name remains. That person shall be designated as the Arbitrator. If for any reason, that person cannot serve, the selected organization shall issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

g) <u>Remedies</u>. Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company shall be responsible for all arbitration filing fees, forum fees, and fees of the arbitrator.

h) <u>Arbitration Opt-Out</u>. Associate may opt-out of this Arbitration Agreement in Section 14 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 14. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 14, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

## 15. Severability.

Except as set forth in Section 14, above, the provisions of this Agreement shall be severable. If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof. If the Class or Representative Action Waiver set forth in Section 14(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

## 16. Survival; Assignability.

The parties agree that the covenants and agreements contained in Sections 8 through 18, including the Arbitration Agreement in Section 14, shall survive the termination of this Agreement and/or the termination of Associate's employment and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title, and/or the expiration of any benefit. This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

## 17. Notices.

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person: if delivered by e-mail or fax (with confirmation of delivery): or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 14(h). Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

## 18. Entire Agreement.

The foregoing is the entire agreement between the Company and Associate as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement shall be effective unless in writing and signed by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 14, by a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 14 and Arbitration Opt-Out in Section 14(h). THIS EMPLOYMENT AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. Checking the button will serve as your electronic signature. Once you have checked that button, a signature date will display in this document, below.**

/s/_____            HRB Resources LLC
　　　Associate                    /s/_____
                                   　Company            Date Signed:_____11/25/2014_____

# EXHIBIT C



**H&R BLOCK®**

# TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between __Carmen_____ __Maurella III___ of __14048 CHICORY TRAIL_____,
                                    (Name)                              (Number & Street or Box No.)

__Homer Glen_____, __IL__ __60491___ ("Associate"), and __HRB Resources LLC_____,
   (City)        (State)   (Zip )

("the Company").  These parties, in consideration of the covenants and agreements set forth below, agree as follows:

## 1.  Employment.

The Company employs Associate as a __5000 - First Year Tax Pro_____ in the Company's __NAPERVILLE, IL_____ District,   Admin.    ID# __12519____, for the period and upon the terms and conditions contained in this Agreement.  Associate accepts such employment and agrees to comply with such terms and conditions.

## 2.  Term.

The term of this Agreement begins on the earlier of the following dates:  the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2015. The term of this Agreement will end on April 20, 2016.

## 3.  Duties.

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block Code of Business Ethics & Conduct.  Associate acknowledges that it is outside the scope of Associate's employment and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

## 4.  Compensation.

The Company will pay Associate an hourly rate of pay, the amount of which will be determined by the Company labor code assigned to a specific project or task.  Different projects or tasks are assigned different pay rates and the Company reserves the right to revise pay rates at any time.  Under no circumstance will the hourly rate for any work performed be less than the federal or applicable state minimum wage.  Associate will be paid for all hours worked, including overtime, in accordance with federal and applicable state wage and hour laws.

## 5.  Withholdings and Offsets.

The Company will withhold from all compensation payable to Associate all required federal, state, and local taxes.  Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

## 6.  Hours.

Associate's hours of employment will be as from time to time designated by the Company.  Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs.  Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment.  Associate agrees to be available to work until the end date of this Agreement.  Associate agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7. Termination.**

a)  Subject to Section 19 below, and notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

b)  Subject to Section 19 below,  the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for termination. For purposes of this Agreement, "Cause" includes, but is not limited to, the following:

(1) Associate's unsatisfactory performance as determined by the Company;

(2) Associate's misconduct that interferes with or prejudices the proper conduct of the Company's business or which may reasonably result in harm to the reputation of the Company;

(3) Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to, the H&R Block Code of Business Ethics & Conduct;

(4) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

(5) Associate's failure to meet the criteria for any Company-mandated background check;

(6) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

(7) Associate's misrepresentation on the employment application or in this Agreement; or

(8) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c)  "Cause" also includes: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

**8. Confidential Information.**

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (together referred to as "H&R Block") the confidential nature of all such information is acknowledged by Associate.  In consideration for the Company providing this access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement.  Associate agrees and acknowledges as follows:

a)  Without the Company's prior written authorization, Associate will not directly or indirectly:  (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties.   Nothing in this Agreement, including the foregoing, prevents Associate from communicating with the Equal Employment Opportunity Commission, the Securities and Exchange Commission, the Department of Labor, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b)  Upon cessation of employment, Associate will promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c) "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, private or sensitive employee information (such as social security information or birth dates, and information obtained from any confidential human resources or employee files/records to which Associate may have access), and H&R Block's tax preparation software. "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use. Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence. Confidential Business Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by §7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

d) The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law. Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret. Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients. For Associates employed in the states of Arkansas, Wisconsin, Connecticut, and Montana, the foregoing limitation on the use or disclosure of Confidential Business Information will only apply for three (3) years after the end of Associate's employment as to information that does not qualify as a Trade Secret.

e) Information will not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f) Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g) The restrictions in this Agreement will supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9. Extent of Services.

Associate agrees that during the term of Associate's employment Associate will not directly or indirectly:

a) Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b) Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed through the Company in accordance with Company policies and procedures as returns prepared by the Company. Associate may prepare and electronically file Associate's own tax return free of charge.

Associate will not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

## 10. Post-Termination Covenants.

a) Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate will not directly or indirectly:

(1)  Provide any of the following services to any Company Client:  (i) preparation of tax returns;  (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2)  Solicit Company Clients for the purpose of offering to such clients:  (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b)  Associate agrees that the Restricted Period for each of the above covenants will be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c)  For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d)  For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e)  In the event a duly appointed arbitrator (or where permitted under Section 17, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f)  Associate will not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g)  Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h)  Section 10(b) is not applicable to associates employed in the states of Georgia or Wisconsin.

i)  For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) will be one (1) year following the cessation of Associate's employment.

j)  For Associates employed in the state of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties of adjacent states), as identified in Attachment A to this Agreement; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Sections 10(a)(1) and (2) in accordance with their terms in states outside of Louisiana.

**11. Nonsolicitation of Employees.**

a)  Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate will not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company.

b)  For purposes of this Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement.  Where required by applicable law to be enforceable, the foregoing restriction will only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

c)  Section 11(a) is not applicable to associates employed in the state of Wisconsin.  Associates employed in Wisconsin covenant that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate will not, directly or indirectly, solicit Company Employees to terminate their employment with the Company.

## 12. Remedies.

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage.  The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company will be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity.  Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief.  In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11.  Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement.  Further, Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below.  Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss.  Associate agrees that this liquidated damages provision shall not be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate will pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season will be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 will otherwise be resolved in accordance with the arbitration agreement in Section 17, unless Associate opts out in accordance with Section 17(h).

## 13. Agreement Regarding Products and Services of H&R Block, H&R Block Bank, and BofI Federal Bank.

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credit, H&R Block Emerald Savings®, H&R Block Emerald Prepaid MasterCard®, Refund Anticipation Checks, Refund Anticipation Loans, credit cards, individual retirement accounts, and other H&R Block-branded bank products and services and in offering other financial products and services of any other financial institution or consumer finance company with which H&R Block partners to offer these products and services.  Associate will comply with all H&R Block and BofI Federal Bank Operating Policies and Procedures and required training related to the above products prior to conducting any facilitation marketing, solicitation, customer service or credit service organization activities.  Associate acknowledges that H&R Block Bank, BofI Federal Bank, and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services.  Associate acknowledges that the primary federal regulator of H&R Block Bank and BofI Federal Bank (the Office of the Comptroller of the Currency) and H&R Block's primary regulator for banking purposes (the Federal Reserve) have the authority to regulate, examine, and take enforcement action against the Company, its affiliates, H&R Block Bank, and BofI Federal Bank with respect to the activities performed in connection with H&R Block Bank's and BofI Federal Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators may have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

## 14. Tax Preparer Penalties.

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate.  Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties.  Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Representations of Associate.**

a) Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement. Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b) Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c) Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties.

**16. Enforcement.**

Associate agrees that the Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time will not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**17. Mutual Arbitration Agreement.**

a) <u>Binding Mutual Arbitration</u>. This Mutual Arbitration Agreement in Section 17 ("Arbitration Agreement") is between Associate and the Company. Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 17(h) below. Any reference to the Company in this Section 17 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation any H&R Block business entity for which Associate applied for employment and/or was employed. This Arbitration Agreement will be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce. This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. **All Covered Claims will be decided by an arbitrator through individual arbitration and not by way of court or jury trial.**

b) <u>Covered Claims</u>. This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Arbitration Agreement or any portion of the Arbitration Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Arbitration Agreement or any portion of the Arbitration Agreement is void or voidable, with the exception noted in Section 17(e) below.

c) <u>Excluded Claims</u>. The following claims and disputes are not subject to arbitration under this Arbitration Agreement: (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which will be determined in accordance with the claims and dispute resolution

procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v) disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes. Regardless of any other terms of this Arbitration Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Arbitration Agreement will be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

d) <u>Further Exclusion</u>. This Arbitration Agreement does not apply to any lawsuits between Associate and the Company already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate is already a member or potential member of the class, collective, or representative action ("Pending Claims"). However, if Associate previously signed (and did not opt out of) an agreement to arbitrate claims with the Company prior to commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate opts out pursuant to Section 17(h) below.

e) <u>Class and Representative Action Waiver</u>.

THE COMPANY AND ASSOCIATE AGREE TO BRING ANY DISPUTE IN ARBITRATION ON AN INDIVIDUAL BASIS ONLY, ACCORDINGLY:

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY SUCH CLAIM ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement, the preceding sentence will not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE UNDER ANY SUCH CLAIM ("Representative Action Waiver"). The Representative Action Waiver does not apply to any claim Associate brings in arbitration as a private attorney general solely on Associate's own behalf and not on behalf of or regarding others. The Representative Action Waiver will be severable from this Agreement in any case in which there is a final judicial determination that the Representative Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances and where the claim is brought as a private attorney general, such private attorney general claim must be litigated in a civil court of competent jurisdiction, but all other provisions of this Agreement and Arbitration Agreement, including without limitation the Class Action Waiver, will continue to apply.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, will be determined only by a court of competent jurisdiction and not by an arbitrator.

f) <u>Selection and Rules</u>.  The parties will select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement.  If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Arbitration Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service, such as www.google.com, to search for "AAA Employment Arbitration Rules").   To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Arbitation Agreement shall govern.  Unless the parties jointly agree otherwise, the Arbitrator will be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator").  Unless the parties jointly agree otherwise, the arbitration will take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator will be selected as follows:  The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains.  That person will be designated as the Arbitrator.  If for any reason, that person cannot serve, the selected organization will issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction.  The arbitration will be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator will hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.  No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

g) <u>Remedies and Fees</u>.  Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator may award  any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement.  The Arbitration shall apply the substantive law including, but not limited to, applicale statutes of limitations (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claims(s) asserted.  The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies.  Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company will be responsible for all arbitration filing fees, forum fees, and fees of the arbitrator.

h) <u>Arbitration Opt-Out</u>.  Associate may opt-out of this Arbitration Agreement in Section 17 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 17.  In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement.  Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 17, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company.  Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

## 18. Severability.

Except as set forth in Section 17, above, the provisions of this Agreement shall be severable.  If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision will not affect the legality, validity or enforceability of the remaining provisions hereof.  If the

Class or Representative Action Waiver set forth in Section 17(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**19. Survival; Assignability.**

Notwithstanding any language to the contrary in this Agreement, the parties agree that the covenants and agreements contained in Sections 8 through 21, including the Arbitration Agreement in Section 17, will survive the termination of this Agreement and/or the termination of Associate's employment and will, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title, and/or the expiration of any benefit.   This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate.  Associate shall not assign this Agreement.  This Agreement will inure to the benefit of the successors and assigns of the Company.

**20. Notices.**

All notices required to be given hereunder shall be in writing and will be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 17(h).  Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**21. Entire Agreement.**

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed (written or electronic) by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 17, by a court of competent jurisdiction.  **Associate understands and agrees to the use of an electronic method of signature to demonstrate acceptance and agreement to the terms of this Agreement.**

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 17. THIS EMPLOYMENT AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. Checking the button will serve as your electronic signature.  Once you have checked that button, a signature date will display in this document, below.**

/s/_____
Associate

/s/ HRB Resources LLC
Company

Date
Signed: 11/25/2014

# EXHIBIT D


**H&R BLOCK**®

# TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between _____ Colleen Rebecca Griffith _____ of _____ 232 Brakel Lane _____,

(Name) (Number & Street or Box No.)

_____ Media _____, _____ PA _____ _____ 19063 _____ ("Associate"), and _____ H&R Block Eastern Enterprises _____,

(City) (State) (Zip )

("the Company").  These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1. Employment.**

The Company employs Associate as a _____ Tax Pro II _____ in the Company's _____ SPRINGFIELD, PA _____ District, Admin. ID# _____ 36500 _____, for the period and upon the terms and conditions herein contained.  Associate hereby accepts such employment and agrees to comply with such terms and conditions.

**2. Term.**

The term of this Agreement begins on the earlier of the following dates:  the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2011.  The term of this Agreement shall end on April 18, 2012.

**3. Duties.**

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block, Inc. Code of Business Ethics & Conduct.  Associate acknowledges that it is outside the scope of Associate's employment hereunder and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

**4. Compensation.**

The Company shall pay Associate an hourly rate of pay, the amount of which shall be determined by the Company labor code assigned to a specific project or task.  Different projects or tasks are assigned different pay rates and the Company reserves the right to revise such rates at any time.  Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage.  Associate shall be paid overtime in accordance with federal and applicable state wage and hour laws.

**5. Withholdings and Offsets.**

The Company shall withhold from all compensation payable to associate all required federal, state, and local taxes.  Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws,  offset the amount of any such funds or indebtedness against any compensation due Associate.

**6. Hours.**

Associate's hours of employment will be as from time to time designated by the Company.  Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs.  Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment.  Associate agrees to be available to work until the end date of this Agreement.  Associate hereby expressly acknowledges and agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7. Termination.**

a) Notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

b) Furthermore, the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for such termination. For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

1) Associate's unsatisfactory performance as determined by the Company;

2) Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to, the H&R Block, Inc. Code of Business Ethics & Conduct;

3) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

4) Associate's failure to meet the criteria for any Company-mandated background check;

5) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

6) Associate's misrepresentation on the employment application or in this Agreement; or

7) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c) "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block, Inc. Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

**8. Confidential Information.**

Associate will be given access to Trade Secrets and other Confidential Business Information of Block which has commercial value to the Company and its affiliates (hereinafter together referred to as "Block") the confidential nature of all such information is hereby acknowledged

by Associate. In consideration for the Company providing such access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement. Associate agrees and acknowledges as follows:

a) Without the Company's prior written authorization, Associate shall not directly or indirectly: (i) misappropriate, make copies of, or remove from Block's offices any Confidential Business Information of Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of Block, or (iii) use any Confidential Business Information of Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder.

b) Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to Block.

c) "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, Block's client lists, information pertaining to Block's clients, employee lists and information, and Block's tax preparation software. "Confidential Business Information" does not include information in the public domain through authorized disclosure by Block or information that Associate has received prior written authorization by Block to disclose or otherwise use.

d) The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law. Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of Block at all times during and after Associate's employment for so long as such information remains a Trade Secret. Trade Secrets include, among other things, Block's client lists and all information pertaining to Block's clients.

e) Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any third party.

f) Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

## 9. Extent of Services.

Associate agrees that during the term of Associate's employment Associate shall not directly or indirectly:

a) Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b) Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed through the Company in accordance with Company policies and procedures as returns prepared by the Company. Associate may prepare and electronically file Associate's own tax return free of charge. For associates employed within the State of Texas, for purposes of this Section 9, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.

Associate shall not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

## 10. Post-Termination Covenants.

a) Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1) Provide any of the following services to any Company Client: (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2) Solicit Company Clients for the purpose of offering to such clients: (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b) Associate agrees that the Restricted Period for each of the above covenants shall be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c) For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d) For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e) In the event a duly appointed arbitrator (or where permitted under Section 19, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement.

f) Associate shall not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g) Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h) Section 10(b) is not applicable to associates employed in the state of Wisconsin.

i) For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) shall be one (1) year following the cessation of Associate's employment.

## 11. Nonsolicitation of Employees.

Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company. For purposes of this Agreement, "Company Employees" mean persons employed by the Company

or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement. For associates employed within the State of Texas, for purposes of this Section 11, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.

Section 11 is not applicable to associates employed in the state of Wisconsin.

**12. Remedies.**

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage. The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity. Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief. In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11. Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement. Further, Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below. Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss. Associate agrees that this liquidated damages provision shall not be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate shall pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season shall be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 shall otherwise be resolved in accordance with the arbitration agreement in Section 19, unless Associate opts out in accordance with Section 21.

**13. Agreement Regarding Products and Services of H&R Block Bank and Other Financial Institutions.**

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance Line of Credit, Emerald Savings, Emerald Prepaid MasterCard®, Emerald Refund Deposit Accounts, and other H&R Block Bank products and in offering Refund Anticipation Loans and Refund Anticipation Checks of any other financial institution with whom H&R Block partners to offer these products. Associate will comply with all H&R Block Operating Policies and Procedures and required training related to the above products prior to conducting any marketing, solicitation, customer service or credit service organization activities. Associate acknowledges that H&R Block Bank and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services. Associate acknowledges that H&R Block Bank's primary regulator (the Office of the Comptroller of the Currency) has the authority to regulate, examine, and take enforcement action against the Company and its affiliates and H&R Block Bank with respect to the activities performed in connection with H&R Block Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to the activities performed in connection with these products or services.

**14. Tax Preparer Penalties.**

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate. Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties. Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Survival; Assignability.**

The parties agree that the covenants and agreements contained in Sections 8 through 23 shall survive the termination of this Agreement. This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

**16. Representations of Associate.**

a)    Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement. Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b)    Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c)    Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties hereunder.

**17. Choice of Law.**

Associate acknowledges that the Company headquarters is located in the State of Missouri and that this Agreement shall be governed by the laws of the State of Missouri without reference to its conflict of law principles.

**18. Enforcement.**

Associate agrees that Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**19. Arbitration.**

a)    Binding Mutual Arbitration. Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Agreement. The arbitration agreement set forth in this Section 19 shall be governed by the Federal Arbitration Act (FAA) and the laws of the State of Missouri to the extent Missouri law is not inconsistent with the FAA. This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company.

b)    Covered Claims. Except for the Excluded Claims (defined below), Covered Claims include any and all claims or disputes between Associate and the Company, or the Company's parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, this Agreement, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the

Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

c)    Excluded Claims. The following claims and disputes are not subject to the arbitration agreement set forth in this Agreement:  (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iv) claims for unemployment compensation benefits, (v) claims within the jurisdiction of the National Labor Relations Board ("NLRB"), and (vi) any claim that is expressly precluded from arbitration by a federal statute or regulation. Nothing in this Agreement shall prohibit Associate from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the NLRB, the U.S. Department of Labor, the Occupational Safety and Health Commission, any other federal, state, or local administrative agency; however, any Covered Claim that is not resolved through the federal, state, or local agency proceedings must be submitted to arbitration in accordance with this Agreement, except for claims within the jurisdiction of the NLRB and where expressly precluded by a federal statute or regulation.  Associate also has the right to challenge the validity of the terms and conditions of this Agreement on any grounds that may exist in law and equity, and the Company shall not discipline, discharge, or engage in any retaliatory actions against Associate in the event Associate chooses to do so or engage in other protected legal activity.  The Company, however, reserves the right to enforce the terms and conditions of this Agreement in any appropriate forum.

d)    **WAIVER. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.**  Associate and the Company further agree that no arbitrator shall have authority to (i) order, authorize, or permit any notice or information about an arbitration or any claims or defenses in an arbitration to be sent to any class or group of persons other than the parties to the individual arbitration, provided that either party or the arbitrator may compel testimony of a witness or the production of documents, material or information consistent with applicable arbitration rules, or (ii) order or require either party to produce any kind of collective information for any class or group of current or former employees of the Company.  Associate further agrees that if Associate is included within any class, collective, or representative action in court or in arbitration involving a Covered Claim, Associate will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.  Any Covered Claim filed or brought in court or arbitration as a class, collective or representative action will be decided in arbitration on an individual basis.  Any issue concerning the validity or enforceability of the Waiver in this Section 19 (including the prohibition against class, collective or representative action arbitration) shall be decided by a court of competent jurisdiction, and no arbitrator shall have any authority to consider or decide any issue concerning the validity or enforceability of the Waiver.  Any issue concerning arbitrability of a particular issue or claim pursuant to the arbitration agreement (except for those concerning the validity or enforceability of the Waiver) must be resolved by the arbitrator, not the court.

e)    Selection and Rules. Except as specified below, any arbitration of a Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS, or any successor forum, in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"), or any successor rules, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing.  Arbitration shall be held in the county in which Associate worked or works at the time the claim arose, or the next nearest county with an arbitral forum.  To the extent any of the terms, conditions or requirements of this Agreement conflict with the JAMS Arbitration Rules or other applicable rules, the terms, conditions or requirements of this Agreement shall govern.  Arbitrators are required to issue a written award and opinion, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction.  The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.  No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration.

f)    Remedies. Subject to the parties' right to appeal or seek vacatur under applicable law, Associate and the Company agree that the decision of the arbitrator will be final and binding on the parties and that the arbitrator is authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs.  As part of Associate's costs, Associate may recover expert fees incurred by Associate to the same extent as Associate could in court.  To the extent that it results in a greater recovery for Associate, the Company agrees to waive the limitations on the recovery of expert fees as an item of costs imposed by 28 U.S.C. § 1821(b) for reasonable expert fees incurred by Associate in any arbitration in which (i) Associate prevails on any Covered Claim(s) in an amount greater than the amount of any prior offer of settlement made by the Company, and (ii) such reasonable expert fees were incurred for an expert report or expert testimony that was admitted into evidence and relied upon by the arbitrator in rendering the award on such Covered Claim(s).  Subject to any applicable fee-shifting provisions, Associate shall be responsible for the filing fee required to institute arbitration with JAMS up to the amount of the filing fee Associate would have incurred had Associate filed such Covered Claim(s) in federal district court.  The Company shall be responsible for all additional arbitration filing fees, forum fees, and other fees and costs assessed by JAMS.

g)    Further Exclusion. Nothing set forth herein applies to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action for which Associate would be a member or potential member of the class, collective, or representative action.

## 20. Severability.

The provisions of this Agreement shall be severable and, if any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof, except that, in the event the Waiver set forth in Section 19(d) is determined to be invalid, unenforceable or void with respect to any Covered Claim(s) initiated or pursued in court or in arbitration on a class, collective or representative action basis and, insofar as any such Covered Claim(s) are permitted to proceed on a class, collective or representative action basis, they must do so in a court of competent jurisdiction and, to the fullest extent permitted by law, Associate and the Company agree to waive any right to a jury trial for any and all such claims.  If the Waiver set forth in Section 19(d) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**21. Arbitration Opt-Out.**

Associate may opt-out of (reject) Section 19 by submitting a signed written statement that Associate wishes to opt-out and not be subject to Section 19 of this Agreement. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out will override Associate's signature below regarding arbitration, but no other provision of this Agreement. Any associate choosing to opt-out will not be subject to any adverse employment action as a consequence of that decision.

**22. Notices.**

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person: if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 21. Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**23. Entire Agreement.**

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed by the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the relevant box on the previous web page (the Contract section of the Automated Hiring Process), you are indicating your agreement to the above terms and conditions , including but not limited to the Arbitration agreement and Waiver in Section 19. Checking the box on the previous web page will serve as your electronic signature. Once you have checked that box, a signature date and confirmation code will display in this document, below.**

☒ /s/ Colleen  Griffith

Associate

/s/ H&R Block Eastern Enterprises

Company

Date Signed: 11/07/2011        Confirmation:   2CUUOQG0        Date Signed:  2/25/2012 3:58:38 AM

# EXHIBIT E



<h1 style="text-align:center">TAX PROFESSIONAL EMPLOYMENT AGREEMENT</h1>

This Agreement is made between __Carmen    Maurella III__ of __14048 CHICORY TRAIL__,
(Name)                                      (Number & Street or Box No.)

__Homer Glen__, __IL__ __60491__ ("Associate"), and __HRB Resources LLC__,
(City)          (State) (Zip )

("the Company"). These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1.   Employment.**

The Co mpany e mploys As sociate  as a ___5000 - First Year Tax Pro___ i n the     Company's
___NAPERVILLE, IL___ D istrict, Adm in. ID # ___12519___, f or t he pe riod and upon t he terms and co nditions h erein con tained.  Asso ciate hereby accepts  such e mployment and ag rees to co mply wit h suc h ter ms and conditions.

**2.   Term.**

The term of this Agreement begins on the earlier of the fo llowing dates:  the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2012. The term of this Agreement shall end on April 16, 2013.

**3.   Duties.**

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns a nd offeri ng el ectronic f iling of retur ns to q ualifying taxpa yers, promoting an d pr oviding ad ditional or alter native products or  services which  the Company  or its affili ates  may offer, providing other informa tion to cl ients that may  be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the la w and the Company's policies and procedures, including the  H&R Block, Inc. Code of Busin ess Ethics & Con duct.  Asso ciate acknowledges  that it is o utside the scope of A ssociate's employment hereunder and is  against the rules of the C ompany for Associate to offer any financial advice for which a license is required.

**4.   Compensation.**

The Company shall pa y Associate an hour ly r ate of pa y, the am ount of which sha ll be de termined by the Compan y labor code assigned to a specific project or task.  Different projects or tasks are assign ed different pay rates and th e Company reserves the right to revise such rates at any time.  Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage.  Associate shall be paid overtime in accordance with federal and applicable state wage and hour laws.

**5.   Withholdings and Offsets.**

The Compa ny s hall wit hhold from al l comp ensation pay able  to Asso ciate a ll required fed eral, s tate, an d l ocal ta xes.  As sociate agrees that if Associate fails  to turn over all Company funds as required by Compan y policy or becomes indeb ted to the Co mpany, the Company, subject to a pplicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

**6.   Hours.**

Associate's hours of employment will be as from time to time designated by the Compan y.  Associa te u nderstands t he se asonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of e mployment ba sed o n bus iness n eeds.  A ssociate r ecognizes a nd agrees that there ma y b e pa y period s dur ing which Associate is not  assigned any hours of employment.  Associate agrees to be available to work until the end date of this Agreement. Associate hereby expressly acknowledges and agrees to abide by the Co mpany's timekeeping policies by ac curately recording all hours worked.

**7.   Termination.**

a)   Notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

b)   Furthermore, t he Compan y may term inate t his Agr eement  and the e mployment of Assoc iate wit hout no tice upon a determination by the Company that Cause exists for such termination.  For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

1) Associate'        s unsatisfactory performance as determined by the Company;

2)        Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to,  the H&R Block, Inc. Code of Business Ethics & Conduct;

3)        Associate's violation of an y term of this  Agreement or  Associate's stated intention t o violate any term of this Agreement;

4)        Associate's failure to meet the criteria for any Company-mandated background check;

5) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

6) Associate's misrepresentation on the employment application or in this Agreement; or

7) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c) "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block, Inc. Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

## 8. Confidential Information.

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (hereinafter together referred to as "H&R Block") the confidential nature of all such information is hereby acknowledged by Associate. In consideration for the Company providing such access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement. As sociate agrees and acknowledges as follows:

a) Without the Company's prior written authorization, Associate shall not directly or indirectly: (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder.

b) Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c) "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, employee lists and information, and H&R Block's tax preparation software. "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use. Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.

d) The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law. Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret. Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.

e) Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f) Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g) The restrictions in this Agreement shall supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9. Extent of Services.

Associate agrees that during the term of Associate's employment Associate shall not directly or indirectly:

a) Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b) Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed through the Company in accordance with Company policies and procedures as returns prepared by the Company. Associate may prepare and electronically file Associate's own tax return free of charge. For associates employed within the State of Texas, for purposes of this Section 9, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.

Associate shall not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

**10. Post-Termination Covenants.**

a)    Associate covenants that for two (2 ) years following the cessation of Asso ciate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1)   Provide any of the following services to any Company Client:  (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2)   Solicit Company Clients for the purpose of offering to such cl ients:  (i) tax retu rn preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b)    Associate agrees that the Restricted Period for each of the above covenants shall be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c)    For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared o r ele ctronically transmitted by  Associate, or fo r whom A ssociate provi ded a ny Alt ernative Products or S ervices, during the term of this Agre ement or during any period of time in which Associate was employed by the C ompany or an affil iate during the twelve (12) months immediately preceding the effective date of this Agreement.

d)    For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, t hat the Company prov ides to cl ients wit hin Associate's district of emp loyment (for ex ample, bookkeeping if provided in such district).

e)    In the event a duly appointed arbitrator (or where permitted under Section 19, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f)    Associate shall not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g)    Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h)    Section 10(b) is not applicable to associates employed in the state of Wisconsin.

i)    For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) shall be one (1) year following the cessation of Associate's employment.

j)    For Associates employed in the State of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties o f adjacent s tates), as ide ntified as in Attachment A to this Agreement provided, ho wever, that no thing in  this Agr eement may be co nstrued t o prohibit  the   enforcement o f Sec tions 1  0(a)(1) an d  (2)  in a ccordance wi th  their  terms in sta tes o utside o f Louisiana.
.

**11. Nonsolicitation of Employees.**

Associate cove nants tha t dur ing Asso ciate's  employment h ereunder and   for one (1) y   ear fol lowing th e ces sation of  such employment for an y reason, A ssociate shall not, directly or indi rectly, solicit or h ire Company Employees to work in an y business that provides any product or services in competition with the Company.  For purposes of th is Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement.  For associates employed within the State of Texas, for purposes of this Section 11, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.  Where required by applicable law to be enforceable, the foregoing restriction shall only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

Section 11 is not applicable to associates employed in the state of Wisconsin.

**12. Remedies.**

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer i rreparable l oss and damage.  Th e parti es f urther agree  that in the even t of a ny such breach or viola tion, w hether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equ ity.  Associate agrees that no bo nd need be filed in connection with any request by t he Company for a   tempor ary restr aining ord er  or other pr eliminary injunctive rel ief.  In  ad dition to i njunctive r elief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11.  Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement.  Further, Associate acknowledges that damages for breach of Section 9 are difficult, if no t impossible, to  establish and  Associate  therefore agrees  to liqu idated da mages a s set f orth b elow.  A ssociate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss.  Associate agrees that this liquidated damages provision shall not be construed as a pa yment to a void Associa te's obligations  under Se ction  8, 9 , 1 0, o r 11 hereof and furt her agrees tha t the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate shall pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season shall be counted as a tax season).

Any v iolation of Section 8, 9, 10, or 11 shall o therwise be r esolved in accordance with t he arbitration agreement i n Section 19, unless Associate opts out in accordance with Section 20.

**13. Agreement Regarding Products and Services of H&R Block Bank and Other Financial Institutions.**

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credi t, H&R Block Emerald Savings®, H&R Block Emerald Card® Prepaid MasterCard®, H&R Block Emerald Plus® Prepaid MasterCard®, Block Loan, Refund Anticipation Checks, credit cards, and other H&R Block Bank products and in offering Refund Anticipation Loans and Refund Anticipation Checks or ot her f inancial produc ts of an y other financial ins titution with w hom H&R Bl ock pa rtners to offer these products. As sociate will comply with a ll H&R Block Operating Policies and Pr ocedures and r equired training related to t he above products prior to condu cting any marketing, soli citation, cu stomer serv ice or credit service organiza tion activ ities. As sociate acknowledges that H&R Block Bank and o ther financial institutions have the right to monitor, review, and a udit activities Associate performs i n co nnection with such en tities' re spective produ cts a nd services. A ssociate ac knowledges t hat H&R B lock B ank's primary r egulator (the Office o f the Comp troller of the Curr ency) and H&R Block's p rimary regu lator for b anking purposes (the Federal Reserve) have t he a uthority to reg ulate, examine, a nd take e nforcement a ction a gainst the Co mpany and i ts af filiates and H&R B lock Bank with re spect to t he ac tivities perfo rmed in co nnection with H&R B lock Bank 's products o r serv ices, and Associate acknowledges that fed eral an d st ate banking a nd consu mer products reg ulators may ha ve the authority t o regul ate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

**14. Tax Preparer Penalties.**

As a condit ion of employ ment, Associat e agre es to provide to the Company, immediately upon receipt, a copy of any notice or communication Assoc iate rec eives from the I nternal R evenue Service or an y state tax ing autho rity re lated to As sociate's tax preparation practices or tax preparer penalties proposed or a ssessed against Associate. As sociate further agrees to authorize the Internal Revenue Serv ice o r st ate tax ing au thority to share wit h the Comp any and its affiliates all no tices and communications related to t he proposed or as sessed p enalties. Asso ciate expressly ackno wledges and ag rees t hat A ssociate ma y be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Survival; Assignability.**

The part ies agree th at the covenants and agr eements contained i n Sections 8 th rough 2 3 shal l s urvive t he ter mination of thi s Agreement. T his Agr eement is as signable by the Co mpany to an y o ther part y wi thout n otice to, co nsent by , o r approv al by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

**16. Representations of Associate.**

a) Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by t he Internal Revenue Serv ice and has never be en suspended or r ejected fro m such progr am prior to thi s Agreement. Associate further represents that Associate has not currently applied for or been accepted as a n Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b) Associate repr esents that al l statements ma de on As sociate's employment applica tion, including those regardin g Associate's criminal background, are true and accurate.

c) Associate repr esents that As sociate is no t s ubject to an y co ntract th at wo uld pro hibit perf ormance o f h is/her d uties hereunder.

**17. Choice of Law.**

Associate ackn owledges t hat t he Compan y h eadquarters i s l ocated in th e Stat e o f Mis souri and tha t th is Agreem ent sh all be governed by the laws of the State of Missouri without reference to its conflict of law principles.

**18. Enforcement.**

Associate agr ees th at Co mpany's fai lure to r equire s trict compliance w ith any ter m, condition, or coven ant contained in th is Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**19. Arbitration.**

a) Binding Mutual Arbitration. Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Agreement. The arbitration agreement set forth in this Section 19 shall be governed by the F ederal Arbitration Act (FAA). T his agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company.

b) Covered Claims. Ex cept for th e Excluded Claims (defined below), Covered Claims in clude any and all claims or disputes between Associate and the Company, or th e Company's parents, su bsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, this Agreement, Associate's employment, compensation, benefits, an d terms an d c onditions of employment wit h the Company, or the te rmination thereof, including bu t n ot lim ited t o contract, tort, defama tion and other co mmon l aw cl aims, wage and hour claim s, s tatutory discr imination, har assment, an d retaliation claims, and claims a rising u nder o r relating to any f ederal, sta te o r local constitution, s tatute o r regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Em ployment Act (" ADEA"), the Worker Adjust ment and R etraining No tification Act ("W ARN"), the Eq ual Pay Act ("EP A"), th e Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any and all oth er federal, state, o r local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Tax Professional
8/15/2012
Page 4

c) Excluded Claims. The following claims and disputes are not subject to the arbitration agreement set forth in this Agreement: (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits, but not individual claims arising out of or relating to claims for workers' compensation benefits, (iv) claims for unemployment compensation benefits, (v) claims within the jurisdiction of the National Labor Relations Board ("NLRB"), and (vi) any claim that is expressly precluded from arbitration by a federal statute. Nothing in this Agreement shall prohibit Associate from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the NLRB, the U.S. Department of Labor, the Occupational Safety and Health Commission, any other federal, state, or local administrative agency; however, any Covered Claim that is not resolved through the federal, state, or local agency proceedings must be submitted to arbitration in accordance with this Agreement, except for claims within the jurisdiction of the NLRB and where expressly precluded by a federal statute. Although an Associate will not be retaliated against, disciplined or threatened with discipline as a result of his or her exercising his or her rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective or representative action in any forum, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class, collective or representative actions or claims. The Company reserves the right to enforce the terms and conditions of this Agreement in any appropriate forum.

d) **WAIVER. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION RE PRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.** Associate and the Company further agree that no arbitrator shall have authority to (i) order, authorize, or permit any notice or information about an arbitration or any claims or defenses in an arbitration to be sent to any class or group of persons other than the parties to the individual arbitration, provided that either party or the arbitrator may compel testimony of a witness or the production of documents, material or information consistent with applicable arbitration rules, or (ii) order or require either party to produce any kind of contact information for any class or group of current or former employees of the Company. Associate further agrees that if Associate is included within any class, collective, or representative action in court or in arbitration involving a Covered Claim, Associate will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any Covered Claim filed or brought in court or arbitration as a class, collective or representative action will be decided in arbitration on an individual basis. Any issue concerning the validity or enforceability of the Waiver in this Section 19 (including the prohibition against class, collective or representative action arbitration) shall be decided by a court of competent jurisdiction, and no arbitrator shall have any authority to consider or decide any issue concerning the validity or enforceability of the Waiver. Any issue concerning arbitrability of a particular issue or claim pursuant to the arbitration agreement (except for those concerning the validity or enforceability of the Waiver) must be resolved by the arbitrator, not the court.

e) Selection and Rules. Except as specified below, any arbitration of a Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS, or any successor forum, in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"), located at http://www.jamsadr.com/rules-employment-arbitration, or any successor rules, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Arbitration shall be held in the county in which Associate worked or works at the time the claim arose, or the next nearest county with an arbitral forum. To the extent any of the terms, conditions or requirements of this Agreement conflict with the JAMS Arbitration Rules or other applicable rules, the terms, conditions or requirements of this Agreement shall govern. Arbitrators are required to issue a written award and opinion, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration.

f) Remedies. Subject to the parties' right to appeal or seek vacatur under applicable law, Associate and the Company agree that the decision of the arbitrator will be final and binding on the parties and that the arbitrator is authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. As part of Associate's costs, Associate may recover expert fees incurred by Associate to the same extent as Associate could in court. To the extent that it results in a greater recovery for Associate, the Company agrees to waive the limitations on the recovery of expert fees as an item of costs imposed by 28 U.S.C. § 1821(b) for reasonable expert fees incurred by Associate in any arbitration in which (i) Associate prevails on any Covered Claim(s) in an amount greater than the amount of any prior offer of settlement made by the Company, and (ii) such reasonable expert fees were incurred for an expert report or expert testimony that was admitted into evidence and relied upon by the arbitrator in rendering the award on such Covered Claim(s). Subject to any applicable fee-shifting provisions, Associate shall be responsible for the filing fee required to institute arbitration with JAMS up to the amount of the filing fee Associate would have incurred had Associate filed such Covered Claim(s) in federal district court. The Company shall be responsible for all additional arbitration filing fees, forum fees, and other fees and costs assessed by JAMS.

g) Further Exclusion. Nothing set forth herein applies to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action for which Associate would be a member or potential member of the class, collective, or representative action.

**20.  Arbitration Opt-Out.**

Associate may opt-out of (reject) Section 19 by submitting a signed written statement that Associate wishes to opt-out and not be subject to Section 19 of this Agreement.  In order to be effective, the written statement must include Associate's full name, address, and employee I D n umber, a nd mu st b e su bmitted to **H&R Block-Legal Department,  Attention: Arbitration Opt-Out , On e H&R B lock Way,  Kansas Ci ty, Missouri 64105** within thirty (30) days o f Associate's signing of t his Agr eement.  A ssociate's written o pt-out wil l over ride A ssociate's s ignature b elow r egarding ar bitration, bu t no o ther pr ovision o f this Agr eement.  Any associate choosing to opt-out will not be subject to any adverse employment action as a consequence of that decision.

**21.  Severability.**

The provisions of this Agreement shall be severable and, if any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof, except that, in the event the Waiver set forth in Section 19(d) is determined to be invalid, unenforceable or void with respect to any Covered Claim(s) initiated or p ursued in co urt or in ar bitration on a c lass, collective or re presentative action basis and, insofar as any such Covered Claim(s) are permitted to proceed on a class, collective or representative action basis, they must do so in a court of competent jurisdiction and, to the fullest extent permitted by law, Associate and the Company agree to waive any right to a jury trial for any and all su ch claims.  If controlling law does not permit waiver of the right to a jury trial as described in t he preceding sentence, the parties' respective rights to a jury trial remain.  If the Waiver set forth in Section 19(d) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**22.  Notices.**

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Comp any at the pr incipal office for the di strict of empl oyment, except as noted in Sect ion 20.  An y notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**23. Entire Agreement.**

The foregoing is the entire Ag reement b etween the par ties as to th e terms and cond itions of As sociate's emp loyment a nd t he subject matter of each of the   paragraphs and subparagraphs of this Agre ement, and  no a mendment of t his  Agreement will be effective unless in writing and signed by the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button,  you are indicating your agreement t o the above   terms and conditions, i ncluding but no t limited to the Arbitration agreement and  Waiver in Sec tion 19 and Arbitration Opt-Out i n Section 20.   Checking the button will serve as your electronic signature. Once you have checked that button, a signature date  will display in this document, below.**

| *Colleen Griffith* | HRB Resources LLC | 11/25/2014 |
| --- | --- | --- |
| **Associate** | **Company** | **Signed Date** |

# EXHIBIT F



**H&R BLOCK**®

## TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between <u>Carmen      Maurella III</u> of <u>14048 CHICORY TRAIL</u>,
                            (Name)                                          (Number & Street or Box No.)

<u>Homer Glen</u>,    <u>IL</u>    <u>60491</u> ("Associate"), and <u>HRB Resources LLC</u>,
   (City)        (State)    (Zip)

("the Company").  These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1.   Employment.**

The Company employs Associate as a <u>5000 - First Year Tax Pro</u> in the Company's
<u>NAPERVILLE, IL</u> District, Admin. ID# <u>12519</u>, for the period and upon the terms and conditions herein contained.  Associate hereby accepts such employment and agrees to comply with such terms and conditions.

**2.   Term.**

The term of this Agreement begins on the earlier of the following dates:  the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2013.  The term of this Agreement shall end on April 16, 2014.

**3.   Duties.**

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block, Inc. Code of Business Ethics & Conduct.  Associate acknowledges that it is outside the scope of Associate's employment hereunder and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

**4.   Compensation.**

The Company shall pay Associate an hourly rate of pay, the amount of which shall be determined by the Company labor code assigned to a specific project or task.  Different projects or tasks are assigned different pay rates and the Company reserves the right to revise such rates at any time.  Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage.  Associate shall be paid overtime in accordance with federal and applicable state wage and hour laws.

**5.   Withholdings and Offsets.**

The Company shall withhold from all compensation payable to Associate all required federal, state, and local taxes.  Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

**6.   Hours.**

Associate's hours of employment will be as from time to time designated by the Company.  Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs.  Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment.  Associate agrees to be available to work until the end date of this Agreement.  Associate hereby expressly acknowledges and agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7.   Termination.**

    a)   Notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

    b)   Furthermore, the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for such termination. For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

        1)   Associate's unsatisfactory performance as determined by the Company;

        2)   Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to,  the H&R Block, Inc. Code of Business Ethics & Conduct;

        3)   Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

        4)   Associate's failure to meet the criteria for any Company-mandated background check;

5)       Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

6)       Associate's misrepresentation on the employment application or in this Agreement; or

7)       Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c)    "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block, Inc. Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

## 8.   Confidential Information.

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (hereinafter together referred to as "H&R Block") the confidential nature of all such information is hereby acknowledged by Associate.  In consideration for the Company providing such access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement.  Associate agrees and acknowledges as follows:

a)    Without the Company's prior written authorization, Associate shall not directly or indirectly:  (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder.  Nothing in this Section 8 shall be construed as limiting or impeding an associate covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information.  "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.  Further, nothing herein shall be construed to prohibit the reporting of a violation of law or to prohibit a disclosure of information that is compelled by law; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b)    Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c)    "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, employee lists and employee data obtained from the Company's confidential personnel files, and H&R Block's tax preparation software.  "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use.  Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.

d)    The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law.  Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret.  Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.

e)    Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f)    Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g)    The restrictions in this Agreement shall supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9.   Extent of Services.

Associate agrees that during the term of Associate's employment Associate shall not directly or indirectly:

a)    Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b)    Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed through the Company in accordance with Company policies and procedures as returns prepared by the Company.  Associate may prepare and electronically file Associate's own tax return free of charge.  For associates employed within the State of Texas, for purposes of this Section 9, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.

Associate shall not be in violation of Section 9(a)(1)  if providing the prohibited services for an H&R Block franchise.

**10. Post-Termination Covenants.**

a)   Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1)   Provide any of the following services to any Company Client:  (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2)   Solicit Company Clients for the purpose of offering to such clients:  (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b)   Associate agrees that the Restricted Period for each of the above covenants shall be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c)   For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d)   For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e)   In the event a duly appointed arbitrator (or where permitted under Section 18, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f)   Associate shall not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g)   Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h)   Section 10(b) is not applicable to associates employed in the state of Wisconsin.

i)   For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) shall be one (1) year following the cessation of Associate's employment.

j)   For Associates employed in the State of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties of adjacent states), as identified in Attachment A to this Agreement; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Sections 10(a)(1) and (2) in accordance with their terms in states outside of Louisiana.

**11. Nonsolicitation of Employees.**

Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company.  For purposes of this Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement.  For associates employed within the State of Texas, for purposes of this Section 11, "Company" means both HRB Technology LLC and H&R Block Enterprises LLC.  Where required by applicable law to be enforceable, the foregoing restriction shall only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

Section 11 is not applicable to associates employed in the state of Wisconsin.

**12. Remedies.**

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage.  The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity.  Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief.  In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11.  Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement.  Further, Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below.  Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss.  Associate agrees that this liquidated damages provision shall not be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate shall pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season shall be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 shall otherwise be resolved in accordance with the arbitration agreement in Section 18, unless Associate opts out in accordance with Section 18(h).

**13. Agreement Regarding Products and Services of H&R Block Bank and Other Financial Institutions.**

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credit, H&R Block Emerald Savings®, H&R Block Emerald Prepaid MasterCard®, Refund Anticipation Checks, credit cards, and other H&R Block Bank products and in offering Refund Anticipation Loans and Refund Anticipation Checks or other financial products of any other financial institution with whom H&R Block partners to offer these products. Associate will comply with all H&R Block Operating Policies and Procedures and required training related to the above products prior to conducting any marketing, solicitation, customer service or credit service organization activities. Associate acknowledges that H&R Block Bank and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services. Associate acknowledges that H&R Block Bank's primary regulator (the Office of the Comptroller of the Currency) and H&R Block's primary regulator for banking purposes (the Federal Reserve) have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and H&R Block Bank with respect to the activities performed in connection with H&R Block Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators may have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

**14. Tax Preparer Penalties.**

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate. Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties. Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Survival; Assignability.**

The parties agree that the covenants and agreements contained in Sections 8 through 21 shall survive the termination of this Agreement and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title. This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

**16. Representations of Associate.**

a) Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement. Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b) Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c) Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties hereunder.

**17. Enforcement.**

Associate agrees that Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**18. Mutual Arbitration Agreement.**

a) Binding Mutual Arbitration. This Mutual Arbitration Agreement in Section 18 ("Arbitration Agreement") is between Associate and the Company. Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 18(h) below. Any reference to the Company in this Section 18 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities. This Arbitration Agreement shall be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce. This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. All Covered Claims shall be decided by an arbitrator through arbitration and not by way of court or jury trial.

b) Covered Claims. This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

c) <u>Excluded Claims</u>. The following claims and disputes are not subject to arbitration under this Arbitration Agreement: (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iv) claims for unemployment compensation benefits, (v) claims within the jurisdiction of the National Labor Relations Board ("NLRB"), (vi) disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Action or other controlling federal statutes, and (vii) claims related to the validity or enforceability of the Arbitration Agreement. Nothing in this Arbitration Agreement shall prohibit Associate from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the NLRB, the U.S. Department of Labor, the Occupational Safety and Health Commission, any other federal, state, or local administrative agency. Although an Associate will not be retaliated against, disciplined or threatened with discipline as a result of his or her exercising his or her rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective or representative action in any forum, the Company may lawfully seek enforcement of this Arbitration Agreement and the Class and Representative Action Waiver under the Federal Arbitration Act and seek dismissal of such class, collective or representative actions or claims. The Company reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

d) <u>Further Exclusion</u>. This Arbitration Agreement does not apply to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate is already a member or potential member of the class, collective, or representative action ("Pending Claims"). This Arbitration Agreement does, however, apply to any Pending Claims that were filed against the Company before Associate was ever employed with the Company. Additionally, if Associate previously signed an agreement to arbitrate claims with the Company prior to commencement of the action seeking to litigate the Previous Claim and the Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim.

e) <u>Class and Representative Action Waiver</u>.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver"). However, this Representative Action Waiver may be severed if it would otherwise render this Arbitration Agreement unenforceable in any action brought under a private attorneys general law, and following severance the representative action must be brought in a court of law and not in arbitration.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator.

f) <u>Selection and Rules</u>. Except as specified below, any arbitration of a Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS, or any successor forum, in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures ("JAMS Arbitration Rules"), located at http://www.jamsadr.com/rules-employment-arbitration or by using a service such as [www.google.com](http://www.google.com) to search for "JAMS Employment Arbitration Rules," and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. Arbitration shall be held in the county in which Associate worked or works at the time the claim arose, or the next nearest county with an arbitral forum. To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the JAMS Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern. Arbitrators are required to issue a written award and opinion, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration unless and except as permitted by applicable law.

g) <u>Remedies</u>. Subject to the parties' right to seek correction, modification, or vacatur under applicable law, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator is authorized to award any party the remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction. As part of Associate's costs, Associate may recover expert fees incurred by Associate to the same extent as Associate could in court. To the extent that it results in a greater recovery for Associate, the Company agrees to waive the limitations on the recovery of expert fees as an item of costs imposed by 28 U.S.C. § 1821(b) for reasonable expert fees incurred by Associate in any arbitration in which (i) Associate prevails on any Covered Claim(s) in an amount greater than the amount of any prior offer of

settlement made by the Company, and (ii) such reasonable expert fees were incurred for an expert report or expert testimony that was admitted into evidence and relied upon by the arbitrator in rendering the award on such Covered Claim(s). The Company shall be responsible for all arbitration filing fees, forum fees, and other fees and costs assessed by JAMS.

h)  Arbitration Opt-Out. Associate may opt-out of this Arbitration Agreement in Section 18 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 18. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 18, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

### 19.  Severability.

Except as set forth in Section 18, above, the provisions of this Agreement shall be severable. If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof. If the Class or Representative Action Waiver set forth in Section 18(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

### 20.  Notices.

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 18(h). Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

### 21.  Entire Agreement.

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 18, by a court of competent jurisdiction. The Arbitration Agreement in Section 18 shall survive the termination of Associate's employment and the expiration of any benefit.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 18 and Arbitration Opt-Out in Section 18(h). Checking the button will serve as your electronic signature. Once you have checked that button, a signature date will display in this document, below.**

/s/ *Colleen Griffith* ____

Associate

/s/ HRB Resources LLC _____

Company

Date Signed: 11/25/2014 _____

# EXHIBIT G



## TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between ___Carmen    Maurella III___ of ___14048 CHICORY TRAIL___,
                                                (Name)                                  (Number & Street or Box No.)

___Homer Glen___, ___IL___ ___60491___ ("Associate"), and ___HRB Resources LLC___,
      (City)          (State)    (Zip)

("the Company"). These parties, in consideration of the covenants and agreements set forth below, agree as follows:

**1.   Employment.**

The Company employs Associate as a ___5000 - First Year Tax Pro___ in the Company's
___NAPERVILLE, IL___ District, Admin. ID# ___12519___, for the period and upon the terms and conditions herein contained. Associate hereby accepts such employment and agrees to comply with such terms and conditions.

**2.   Term.**

The term of this Agreement begins on the earlier of the following dates: the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2014. The term of this Agreement shall end on April 16, 2015.

**3.   Duties.**

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block, Inc. Code of Business Ethics & Conduct. Associate acknowledges that it is outside the scope of Associate's employment hereunder and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

**4.   Compensation.**

The Company shall pay Associate an hourly rate of pay, the amount of which shall be determined by the Company labor code assigned to a specific project or task. Different projects or tasks are assigned different pay rates and the Company reserves the right to revise such rates at any time. Under no circumstance shall the hourly rate for any work performed be less than the federal or applicable state minimum wage. Associate shall be paid for all hours worked, including overtime, in accordance with federal and applicable state wage and hour laws.

**5.   Withholdings and Offsets.**

The Company shall withhold from all compensation payable to Associate all required federal, state, and local taxes. Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

**6.   Hours.**

Associate's hours of employment will be as from time to time designated by the Company. Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs. Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment. Associate agrees to be available to work until the end date of this Agreement. Associate hereby expressly acknowledges and agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7.   Termination.**

a)   Notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

b)   Furthermore, the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for such termination. For purposes of this Agreement, "Cause" shall include, but is not limited to, the following:

(1)   Associate's unsatisfactory performance as determined by the Company;

(2)   Associate's misconduct that interferes with or prejudices the proper conduct of the Company's business or which may reasonably result in harm to the reputation of the Company;

(3)   Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to, the H&R Block, Inc. Code of Business Ethics & Conduct;

(4) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

(5) Associate's failure to meet the criteria for any Company-mandated background check;

(6) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

(7) Associate's misrepresentation on the employment application or in this Agreement; or

(8) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c)  "Cause" shall also include: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block, Inc. Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

## 8.   Confidential Information.

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (hereinafter together referred to as "H&R Block") the confidential nature of all such information is hereby acknowledged by Associate.  In consideration for the Company providing such access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement.  Associate agrees and acknowledges as follows:

a)  Without the Company's prior written authorization, Associate shall not directly or indirectly:  (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties hereunder.  Nothing in this Section 8 shall be construed as limiting or impeding an associate covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing Terms and Conditions Information.  "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.  Further, nothing herein shall be construed to prohibit the reporting of a violation of law or to prohibit a disclosure of information that is compelled by law; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b)  Upon cessation of employment hereunder, Associate shall promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c)  "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, private or sensitive employee information (such as social security information or birth dates, and information obtained from any confidential human resources or employee files/records to which Associate may have access), and H&R Block's tax preparation software.  "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use. Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.

d)  The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law.  Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret.  Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.

e)  Information shall not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f)  Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g)  The restrictions in this Agreement shall supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9.   Extent of Services.

Associate agrees that during the term of Associate's employment Associate shall not directly or indirectly:

a)  Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b)  Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed

through the Company in accordance with Company policies and procedures as returns prepared by the Company. Associate may prepare and electronically file Associate's own tax return free of charge.

Associate shall not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

**10. Post-Termination Covenants.**

a) Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1) Provide any of the following services to any Company Client: (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2) Solicit Company Clients for the purpose of offering to such clients: (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b) Associate agrees that the Restricted Period for each of the above covenants shall be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c) For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d) For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e) In the event a duly appointed arbitrator (or where permitted under Section 17, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f) Associate shall not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g) Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h) Section 10(b) is not applicable to associates employed in the states of Georgia or Wisconsin.

i) For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) shall be one (1) year following the cessation of Associate's employment.

j) For Associates employed in the State of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties of adjacent states), as identified in Attachment A to this Agreement; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Sections 10(a)(1) and (2) in accordance with their terms in states outside of Louisiana.

**11. Nonsolicitation of Employees.**

a) Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company.

b) For purposes of this Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement. Where required by applicable law to be enforceable, the foregoing restriction shall only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

c) Section 11(a) is not applicable to associates employed in the state of Wisconsin. Associates employed in Wisconsin covenant that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate shall not, directly or indirectly, solicit Company Employees to terminate their employment with the Company.

**12. Remedies.**

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage. The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company shall be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity. Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief. In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11. Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement. Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below. Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss. Associate agrees that this liquidated damages provision shall not

be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate shall pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season shall be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 shall otherwise be resolved in accordance with the arbitration agreement in Section 17, unless Associate opts out in accordance with Section 17(h).

**13. Agreement Regarding Products and Services of H&R Block, H&R Block Bank, and BofI Federal Bank.**

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credit, H&R Block Emerald Savings®, H&R Block Emerald Prepaid MasterCard®, Refund Anticipation Checks, credit cards, and other H&R Block-branded bank products and services and in offering other financial products and services of any other financial institution with which H&R Block partners to offer these products and services. Associate will comply with all H&R Block and BofI Federal Bank Operating Policies and Procedures and required training related to the above products prior to conducting any facilitation marketing, solicitation, customer service or credit service organization activities. Associate acknowledges that H&R Block Bank, BofI Federal Bank, and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services. Associate acknowledges that the primary federal regulator of H&R Block Bank and BofI Federal Bank (the Office of the Comptroller of the Currency) and H&R Block's primary regulator for banking purposes (the Federal Reserve) have the authority to regulate, examine, and take enforcement action against the Company, its affiliates, H&R Block Bank, and BofI Federal Bank with respect to the activities performed in connection with H&R Block Bank's and BofI Federal Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators may have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

**14. Tax Preparer Penalties.**

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate. Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties. Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Representations of Associate.**

a)     Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement. Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b)     Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c)     Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties hereunder.

**16. Enforcement.**

Associate agrees that the Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time shall not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**17. Mutual Arbitration Agreement.**

a)     <u>Binding Mutual Arbitration</u>.  This Mutual Arbitration Agreement in Section 17 ("Arbitration Agreement") is between Associate and the Company.  Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 17(h) below. Any reference to the Company in this Section 17 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation any H&R Block business entity for which Associate applied for employment and/or was employed.  This Arbitration Agreement shall be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce.  This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. All Covered Claims shall be decided by an arbitrator through individual arbitration and not by way of court or jury trial.

b)     <u>Covered Claims</u>.  This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act

("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Arbitration Agreement or any portion of the Arbitration Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Arbitration Agreement or any portion of the Arbitration Agreement is void or voidable, with the exception noted in Section 17(e) below.

c) <u>Excluded Claims</u>.  The following claims and disputes are not subject to arbitration  under this Arbitration Agreement:  (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v)  disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes.  Regardless of any other terms of this Arbitration Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Arbitration Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency.

d) <u>Further Exclusion</u>.  This Arbitration Agreement does not apply to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate  is already  a member or potential member of the class, collective, or representative action ("Pending Claims").  This Arbitration Agreement <u>does</u>, however, apply to any Pending Claims that were filed against the Company before Associate was ever employed with the Company. Additionally, if Associate previously signed (and did not opt out of) an agreement to arbitrate claims with the Company prior to commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate opts out pursuant to Section 17(h) below.

e) <u>Class and Representative Action Waiver</u>.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION.

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION ("Class Action Waiver").  Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver").  However, this Representative Action Waiver may be severed if it would otherwise render this Arbitration Agreement unenforceable in any action brought under a private attorneys general law, and following severance the representative action must be brought in a court of law and not in arbitration.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator.

f) <u>Selection and Rules</u>.  The parties shall select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement. If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Arbitration Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".)  To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.  Unless the parties jointly agree otherwise, the Arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator").  Unless the parties jointly agree otherwise, the arbitration shall take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator shall be selected as follows:  The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains.  That person shall be designated as the Arbitrator.  If for any reason, that person cannot serve, the selected organization shall issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

g)  <u>Remedies</u>. Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company shall be responsible for all arbitration filing fees, forum fees, and fees of the arbitrator.

h)  <u>Arbitration Opt-Out</u>. Associate may opt-out of this Arbitration Agreement in Section 17 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 17. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 17, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

**18.  Severability.**

Except as set forth in Section 17, above, the provisions of this Agreement shall be severable. If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof. If the Class or Representative Action Waiver set forth in Section 17(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**19.  Survival; Assignability.**

The parties agree that the covenants and agreements contained in Sections 8 through 21, including the Arbitration Agreement in Section 17, shall survive the termination of this Agreement and/or the termination of Associate's employment and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title, and/or the expiration of any benefit. This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate. Associate shall not assign this Agreement. This Agreement shall inure to the benefit of the successors and assigns of the Company.

**20.  Notices.**

All notices required to be given hereunder shall be in writing and shall be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 17(h). Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**21.  Entire Agreement.**

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 17, by a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 17 and Arbitration Opt-Out in Section 17(h). THIS EMPLOYMENT AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.** Checking the button will serve as your electronic signature. Once you have checked that button, a signature date will display in this document, below.

/s/ Colleen Griffith _____
Associate

/s/ _____ HRB Resources LLC _____
Company

Date Signed: 11/25/2014 _____

# EXHIBIT H



## MUTUAL ARBITRATION AGREEMENT

**1.  Binding Mutual Arbitration**.

This Mutual Arbitration Agreement ("Agreement") is between the undersigned Associate (hereafter "Associate") and HRB Tax Group, Inc. and such other H&R Block business entity for which Associate is employed (collectively, "H&R Block"). Associate and H&R Block agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Agreement, unless Associate opts out pursuant to Section 8 below.  For purposes of this Agreement, any reference to the "Company" shall include H&R Block and H&R Block's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation HRB Resources LLC, HRB Green Resources LLC, HRB Professional Resources LLC, H&R Block Eastern Enterprises, Inc. and H&R Block Enterprises LLC.  This Agreement shall be governed by the Federal Arbitration Act (FAA) (9 U.S.C. section 1 et seq.), and evidences a transaction involving commerce. This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. All Covered Claims shall be decided by an arbitrator through individual arbitration and not by way of court or jury trial.

**2.  Covered Claims**.

This Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration.  Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Agreement or any portion of the Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Agreement or any portion of the Agreement is void or voidable, with the exception noted in Section 5 below.

**3.  Excluded Claims**.

The following claims and disputes are not subject to arbitration under this Agreement: (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which shall be determined in accordance with the claims and dispute resolution procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v) disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes. Regardless of any other terms of this Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency.

**4.  Further Exclusion**.

This Agreement does not apply to any causes of action already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate is already a member or potential

member of the class, collective or representative action ("Pending Claims"). This Agreement does, however, apply to any Pending Claims that were filed against the Company before Associate was employed with the Company. Additionally, if Associate previously signed (and did not opt-out of) an agreement to arbitrate claims with the Company prior to the commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate effectively opts-out of this Agreement pursuant to Section 8 below.

**5.** **Class and Representative Action Waiver**.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ASSOCIATE AND THE COMPANY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED OR MAINTAINED ON A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT ASSOCIATE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION REPRESENTATIVE OR AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER, OR RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION. THE COMPANY DOES NOT CONSENT TO, AND THE ARBITRATOR SHALL HAVE NO RIGHT OR AUTHORITY TO HEAR, ANY CLAIM AND/OR DISPUTE COVERED UNDER THIS AGREEMENT AS A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION.

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, any class and/or collective action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver"). However, this Representative Action Waiver may be severed if it would otherwise render this Agreement unenforceable in any action brought under a private attorneys general law, and following severance the representative action must be brought in a court of law and not in arbitration.

Notwithstanding any other clause or language contained in this Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator.

**6.** **Selection and Rules**.

The parties shall select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement. If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".) To the extent any of the terms, conditions or requirements of this Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Agreement shall govern. Unless the parties jointly agree otherwise, the Arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator"). Unless the parties jointly agree otherwise, the arbitration shall take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator shall be selected as follows: The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains. That person shall be designated as the Arbitrator. If for any reason, that person cannot serve, the selected organization shall issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the Arbitrator shall hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision shall have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

**7.** **Remedies**.

Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the Arbitrator will be final and binding on the parties and that the Arbitrator may award any party any

remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company shall be responsible for all arbitration filing fees, forum fees, and fees of the Arbitrator.

**8.** **Arbitration Opt-Out**.

Associate may opt-out of this Agreement by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Agreement. In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105 within thirty (30) days of Associate's signing of this Agreement. Associate's written opt-out will override Associate's signature below to this Agreement, but not as to any prior or future arbitration agreements between Associate and the Company. Any associate choosing to opt-out will not be subject to any adverse employment action as a consequence of that decision.

**9.** **Sole and Entire Agreement**.

This is the complete agreement of the parties on the subject of arbitration of Covered Claims. This Agreement to arbitrate shall survive the termination of my assignment/employment and the expiration of any benefit. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as specifically set forth in this Agreement. Notwithstanding any contrary language, if any, in this Agreement and/or in any Company policy or handbook, this Arbitration Agreement may not be modified, revised or terminated absent a writing signed (written or electronically) by both parties. This Agreement does not prevent enforcement of any restrictive covenant(s) or confidentiality obligations entered into between Associate and the Company.

**10.** **Severability**.

Except as stated in Section 5, above, the provisions of this Agreement shall be severable and, if any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof.

**11.** **Consideration**.

The mutual obligations by the Company and by Associate to arbitrate differences provide consideration for each other.

**BY CLICKING THE "SIGN AND SUBMIT" BUTTON BELOW, I ACKNOWLEDGE THAT I HAVE CAREFULLY READ AND UNDERSTAND THIS AGREEMENT AND AGREE TO ITS TERMS. I AGREE THAT THROUGH THIS AGREEMENT, THE COMPANY AND I ARE GIVING UP OUR RIGHTS TO A COURT OR JURY TRIAL AND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT, WE ARE AGREEING TO ARBITRATE DISPUTES COVERED BY THIS AGREEMENT. THIS ARBITRATION AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. I FURTHER UNDERSTAND AND AGREE TO THE USE OF AN ELECTRONIC METHOD OF SIGNATURE TO DEMONSTRATE MY ACCEPTANCE AND AGREEMENT TO THE TERMS OF THIS AGREEMENT.**

/s/ _Colleen Griffith_____
Associate

/s/_____  H&R BLOCK
Company

Date Signed: ___11/25/2014___

# EXHIBIT I

 **H&R BLOCK**®

## TAX PROFESSIONAL EMPLOYMENT AGREEMENT

This Agreement is made between ___Carmen___ ___Maurella III___ of ___14048 CHICORY TRAIL___,
(Name)      (Number & Street or Box No.)

___Homer Glen___, ___IL___ ___60491___ ("Associate"), and ___HRB Resources LLC___,
(City)   (State)   (Zip )

("the Company"). These parties, in consideration of the covenants and agreements set forth below, agree as follows:

### 1. Employment.

The Company employs Associate as a ___5000 - First Year Tax Pro___ in the Company's ___NAPERVILLE, IL___ District, Admin. ID# ___12519___, for the period and upon the terms and conditions contained in this Agreement. Associate accepts such employment and agrees to comply with such terms and conditions.

### 2. Term.

The term of this Agreement begins on the earlier of the following dates: the date Associate first attends Skills to Win training; the date Associate attends any other paid training; or December 1, 2015. The term of this Agreement will end on April 20, 2016.

### 3. Duties.

Associate's duties consist of attending Skills to Win training, mid-season training, and other mandatory training, preparing accurate tax returns and offering electronic filing of returns to qualifying taxpayers, promoting and providing additional or alternative products or services which the Company or its affiliates may offer, providing other information to clients that may be relevant to their tax and financial situation, and performing other duties as assigned, all in accordance with the law and the Company's policies and procedures, including the H&R Block Code of Business Ethics & Conduct. Associate acknowledges that it is outside the scope of Associate's employment and is against the rules of the Company for Associate to offer any financial advice for which a license is required.

### 4. Compensation.

The Company will pay Associate an hourly rate of pay, the amount of which will be determined by the Company labor code assigned to a specific project or task. Different projects or tasks are assigned different pay rates and the Company reserves the right to revise pay rates at any time. Under no circumstance will the hourly rate for any work performed be less than the federal or applicable state minimum wage. Associate will be paid for all hours worked, including overtime, in accordance with federal and applicable state wage and hour laws.

### 5. Withholdings and Offsets.

The Company will withhold from all compensation payable to Associate all required federal, state, and local taxes. Associate agrees that if Associate fails to turn over all Company funds as required by Company policy or becomes indebted to the Company, the Company may, subject to applicable laws, offset the amount of any such funds or indebtedness against any compensation due Associate.

### 6. Hours.

Associate's hours of employment will be as from time to time designated by the Company. Associate understands the seasonal nature and fluctuation of the Company's business and acknowledges the Company's exclusive right to reduce or increase Associate's hours of employment based on business needs. Associate recognizes and agrees that there may be pay periods during which Associate is not assigned any hours of employment. Associate agrees to be available to work until the end date of this Agreement. Associate agrees to abide by the Company's timekeeping policies by accurately recording all hours worked.

**7. Termination.**

a)  Subject to Section 19 below, and notwithstanding the above-described Term, either party may terminate this Agreement upon seven (7) days prior written notice.

b)  Subject to Section 19 below,  the Company may terminate this Agreement and the employment of Associate without notice upon a determination by the Company that Cause exists for termination. For purposes of this Agreement, "Cause" includes, but is not limited to, the following:

(1) Associate's unsatisfactory performance as determined by the Company;

(2) Associate's misconduct that interferes with or prejudices the proper conduct of the Company's business or which may reasonably result in harm to the reputation of the Company;

(3) Associate's disobedience, insubordination, job abandonment, fraud, theft, or any material violation of Company policies including, but not limited to, the H&R Block Code of Business Ethics & Conduct;

(4) Associate's violation of any term of this Agreement or Associate's stated intention to violate any term of this Agreement;

(5) Associate's failure to meet the criteria for any Company-mandated background check;

(6) Associate's conviction of or plea of guilty or no contest to a crime of dishonesty or theft during or prior to Associate's employment (subject to state law);

(7) Associate's misrepresentation on the employment application or in this Agreement; or

(8) Associate's failure to secure a Preparer Tax Identification Number (PTIN) in accordance with IRS regulations and Company requirements.

c)   "Cause" also includes: (i) Associate's violation of any term of any prior employment agreement between Associate and the Company, (ii) fraud or theft by Associate during any prior period of employment with the Company, and (iii) material violation of any Company policy, including the H&R Block Code of Business Ethics & Conduct, by Associate during any prior period of employment with the Company.

**8. Confidential Information.**

Associate will be given access to Trade Secrets and other Confidential Business Information which has commercial value to the Company and its affiliates (together referred to as "H&R Block") the confidential nature of all such information is acknowledged by Associate.  In consideration for the Company providing this access, and as a material term of this Agreement, Associate gives the Company the covenants contained in Sections 8, 9, 10, and 11 of this Agreement.  Associate agrees and acknowledges as follows:

a)  Without the Company's prior written authorization, Associate will not directly or indirectly:  (i) misappropriate, make copies of, or remove from H&R Block's offices any Confidential Business Information of H&R Block, (ii) make known, divulge, or communicate to any person or entity any Confidential Business Information of H&R Block, or (iii) use any Confidential Business Information of H&R Block for any reason other than as necessary to enable Associate to properly perform Associate's duties.   Nothing in this Agreement, including the foregoing, prevents Associate from communicating with the Equal Employment Opportunity Commission, the Securities and Exchange Commission, the Department of Labor, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations; provided, however, that to the extent allowed by law, Associate will give the Company as much written notice as possible under the circumstances and will cooperate with the Company in any legal action undertaken to protect the confidentiality of the information.

b)  Upon cessation of employment, Associate will promptly deliver to the Company the originals and all copies of Confidential Business Information and other materials and property of any nature belonging to H&R Block.

c)  "Confidential Business Information" means all information learned by Associate as a consequence of Associate's employment with the Company, including, but not limited to, H&R Block's client lists, information pertaining to H&R Block's clients, private or sensitive employee information (such as social security information or birth dates, and information obtained from any confidential human resources or employee files/records to which Associate may have access), and H&R Block's tax preparation software.  "Confidential Business Information" does not include information in the public domain through authorized disclosure by H&R Block or information that Associate has received prior written authorization by H&R Block to disclose or otherwise use.  Confidential Business Information does include information about the business affairs of third parties (including, but not limited to, the Company's clients) that such third parties provide to the Company in confidence.  Confidential Business Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by §7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

d)  The designation of any information as Confidential Business Information does not preclude it from also constituting a Trade Secret as defined by applicable law.  Associate is prohibited from using, disclosing, or misappropriating Trade Secrets of H&R Block at all times during and after Associate's employment for so long as such information remains a Trade Secret.  Trade Secrets include, among other things, H&R Block's client lists and all information pertaining to H&R Block's clients.  For Associates employed in the states of Arkansas, Wisconsin, Connecticut, and Montana, the foregoing limitation on the use or disclosure of Confidential Business Information will only apply for three (3) years after the end of Associate's employment as to information that does not qualify as a Trade Secret.

e)  Information will not be deemed to have lost its status as a Trade Secret or Confidential Business Information as the result of any unauthorized disclosure by Associate or any other person or third party.

f)  Section 7216 of the Internal Revenue Code of 1986, as amended, prohibits the unauthorized use and/or disclosure of confidential tax return information of the Company's clients, and Associate agrees that Associate will not at any time disclose or use such information in violation thereof.

g)  The restrictions in this Agreement will supplement, but not replace, any and all obligations Associate owes the Company under applicable law.

## 9.  Extent of Services.

Associate agrees that during the term of Associate's employment Associate will not directly or indirectly:

a)  Compete with the Company at any location or in any capacity by:

(1) preparing or electronically filing tax returns or providing any other product or service that the Company offers in the Associate's district of employment (for example, bookkeeping if provided in the district); or

(2) soliciting or accepting any of the Company's clients for the aforementioned services.

b)  Be an Electronic Return Originator ("ERO") with the IRS.

Associate agrees and accepts as a condition of employment that during the term of Associate's employment all tax returns Associate prepares, including any returns Associate prepares for friends and family, but excluding Associate's own return, must be processed through the Company in accordance with Company policies and procedures as returns prepared by the Company.  Associate may prepare and electronically file Associate's own tax return free of charge.

Associate will not be in violation of Section 9(a)(1) if providing the prohibited services for an H&R Block franchise.

## 10.  Post-Termination Covenants.

a)  Associate covenants that for two (2) years following the cessation of Associate's employment hereunder for any reason (the "Restricted Period"), Associate will not directly or indirectly:

(1)  Provide any of the following services to any Company Client:  (i) preparation of tax returns; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services; or

(2)  Solicit Company Clients for the purpose of offering to such clients:  (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services.

b)  Associate agrees that the Restricted Period for each of the above covenants will be tolled during (i) any period(s) of violation that occur during the original Restricted Period; and (ii) any period(s) of time required by litigation to enforce the covenant (other than any periods during which Associate is enjoined from engaging in the prohibited activity and is in compliance with such order of enjoinment) provided that the litigation is filed within one year following the end of the original Restricted Period.

c)  For purposes of this Section 10, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted by Associate, or for whom Associate provided any Alternative Products or Services, during the term of this Agreement or during any period of time in which Associate was employed by the Company or an affiliate during the twelve (12) months immediately preceding the effective date of this Agreement.

d)  For purposes of this Section 10, "Alternative Products or Services" means products or services, other than the preparation or electronic filing of tax returns, that the Company provides to clients within Associate's district of employment (for example, bookkeeping if provided in such district).

e)  In the event a duly appointed arbitrator (or where permitted under Section 17, a court of competent jurisdiction) finds the time period, geographic scope, scope of activity, or any definition contained in this Section 10 to be overly broad, the time period, geographic scope, scope of activity, or definition that such arbitrator or court deems reasonable shall be substituted for the language in this Agreement (where allowed by applicable law).

f)  Associate will not be in violation of Section 10(a)(1) if providing the prohibited services for an H&R Block franchise.

g)  Sections 10(a) and (b) are not applicable to associates employed in the state of North Dakota.

h)  Section 10(b) is not applicable to associates employed in the states of Georgia or Wisconsin.

i)  For Associates employed in the state of Arizona or Puerto Rico, the Restricted Period in Section 10(a) will be one (1) year following the cessation of Associate's employment.

j)  For Associates employed in the state of Louisiana, Sections 10(a)(1) and (2) are limited within the state of Louisiana to the Parishes in which Associate assisted Company in providing its products and services, and Parishes adjacent to such Parishes (or counties of adjacent states), as identified in Attachment A to this Agreement; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Sections 10(a)(1) and (2) in accordance with their terms in states outside of Louisiana.

**11. Nonsolicitation of Employees.**

a)  Associate covenants that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate will not, directly or indirectly, solicit or hire Company Employees to work in any business that provides any product or services in competition with the Company.

b)  For purposes of this Agreement, "Company Employees" mean persons employed by the Company or its affiliates at the time of the solicitation or hiring or at any time during the term of this Agreement.  Where required by applicable law to be enforceable, the foregoing restriction will only apply to Company Employees employed by Company or its affiliates within the District identified in Section 1.

c)  Section 11(a) is not applicable to associates employed in the state of Wisconsin.  Associates employed in Wisconsin covenant that during Associate's employment hereunder and for one (1) year following the cessation of such employment for any reason, Associate will not, directly or indirectly, solicit Company Employees to terminate their employment with the Company.

## 12. Remedies.

The parties agree that if any provision of Section 8, 9, 10, or 11 is violated, the Company will have no adequate remedy at law and will suffer irreparable loss and damage. The parties further agree that in the event of any such breach or violation, whether threatened or actual, the Company will be entitled to injunctive relief to prohibit or restrain such breach or violation in addition to all other remedies available at law or equity. Associate agrees that no bond need be filed in connection with any request by the Company for a temporary restraining order or other preliminary injunctive relief. In addition to injunctive relief, Associate acknowledges that the Company is entitled to damages for any breach of Section 8, 9, 10, or 11. Further, in the event of such breach or violation, Associate shall pay the Company all costs, reasonable attorneys' fees, and expenses incurred by the Company in enforcing Sections 8, 9, 10, or 11 of this Agreement. Further, Associate acknowledges that damages for breach of Section 9 are difficult, if not impossible, to establish and Associate therefore agrees to liquidated damages as set forth below. Associate acknowledges and agrees that these sums are a reasonable forecast of the harm caused by the breach in light of the anticipated or actual loss caused by a breach and the difficulties of proof of loss. Associate agrees that this liquidated damages provision shall not be construed as a payment to avoid Associate's obligations under Section 8, 9, 10, or 11 hereof and further agrees that the Company shall be entitled to injunctive relief in addition to enforcement of this liquidated damages provision.

In the event Associate breaches Section 9 of this Agreement, Associate will pay to Company a lump sum of $1,000 per tax season of employment up to a $10,000 maximum (a partial tax season will be counted as a tax season).

Any violation of Section 8, 9, 10, or 11 will otherwise be resolved in accordance with the arbitration agreement in Section 17, unless Associate opts out in accordance with Section 17(h).

## 13. Agreement Regarding Products and Services of H&R Block and BofI Federal Bank.

Associate agrees to comply with the following conditions in offering the H&R Block Emerald Advance® Line of Credit, H&R Block Emerald Savings®, H&R Block Emerald Prepaid MasterCard®, Refund Anticipation Checks, Refund Anticipation Loans, credit cards, individual retirement accounts, and other H&R Block-branded financial products and services and in offering other financial products and services of any other financial institution or consumer finance company with which H&R Block partners to offer these products and services. Associate will comply with all H&R Block and BofI Federal Bank Operating Policies and Procedures and required training related to the above products prior to conducting any facilitation marketing, solicitation, customer service or credit service organization activities. Associate acknowledges that BofI Federal Bank and other financial institutions have the right to monitor, review, and audit activities Associate performs in connection with such entities' respective products and services. Associate acknowledges that the primary federal regulator of BofI Federal Bank the Office of the Comptroller of the Currency has the authority to regulate, examine, and take enforcement action against the Company, its affiliates, and BofI Federal Bank with respect to the activities performed in connection with BofI Federal Bank's products or services, and Associate acknowledges that federal and state banking and consumer products regulators may have the authority to regulate, examine, and take enforcement action against the Company and its affiliates and other financial institutions with respect to certain activities performed in connection with these products or services.

## 14. Tax Preparer Penalties.

As a condition of employment, Associate agrees to provide to the Company, immediately upon receipt, a copy of any notice or communication Associate receives from the Internal Revenue Service or any state taxing authority related to Associate's tax preparation practices or tax preparer penalties proposed or assessed against Associate. Associate further agrees to authorize the Internal Revenue Service or state taxing authority to share with the Company and its affiliates all notices and communications related to the proposed or assessed penalties. Associate expressly acknowledges and agrees that Associate may be personally responsible for paying preparer penalties assessed by the Internal Revenue Service or state taxing authority.

**15. Representations of Associate.**

a) Associate represents that Associate has never had a Form 8633 (Application to Participate in the Electronic Filing Program) denied by the Internal Revenue Service and has never been suspended or rejected from such program prior to this Agreement. Associate further represents that Associate has not currently applied for or been accepted as an Electronic Filer other than by virtue of any application made through or on behalf of the Company.

b) Associate represents that all statements made on Associate's employment application, including those regarding Associate's criminal background, are true and accurate.

c) Associate represents that Associate is not subject to any contract that would prohibit performance of his/her duties.

**16. Enforcement.**

Associate agrees that the Company's failure to require strict compliance with any term, condition, or covenant contained in this Agreement at any time will not be deemed a waiver of that or any other term, condition, or covenant contained in this Agreement.

**17. Mutual Arbitration Agreement.**

a) <u>Binding Mutual Arbitration</u>. This Mutual Arbitration Agreement in Section 17 ("Arbitration Agreement") is between Associate and the Company. Associate and the Company agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement, unless Associate opts out pursuant to Section 17(h) below. Any reference to the Company in this Section 17 will be a reference also to the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor entities, including without limitation any H&R Block business entity for which Associate applied for employment and/or was employed. This Arbitration Agreement will be governed by the Federal Arbitration Act (FAA) (9 U.S.C. sections 1 et seq.), and evidences a transaction involving commerce. This agreement to arbitrate applies with respect to all Covered Claims, whether initiated by Associate or the Company. **All Covered Claims will be decided by an arbitrator through individual arbitration and not by way of court or jury trial.**

b) <u>Covered Claims</u>. This Arbitration Agreement is intended to be as broad as legally permissible and to apply to the resolution of disputes that otherwise could be resolved in a court of law or before a forum other than arbitration. Except for the Excluded Claims (defined below), Covered Claims include any and all past, present, and future claims or disputes between Associate and the Company, or the Company's direct or indirect parents, subsidiaries, affiliates, predecessors, and successor corporations and business entities, and its and their officers, directors, employees, and agents, including but not limited to claims and disputes arising out of or in any way relating to Associate's hiring or recruitment, Associate's employment, compensation, benefits, and terms and conditions of employment with the Company, or the termination thereof, including but not limited to contract, tort, defamation and other common law claims, wage and hour claims, statutory discrimination, harassment, and retaliation claims, and claims arising under or relating to any federal, state or local constitution, statute or regulation, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Fair Credit Reporting Act ("FCRA"), and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Further, Covered Claims include any disputes regarding this Arbitration Agreement or any portion of the Arbitration Agreement or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Arbitration Agreement or any portion of the Arbitration Agreement is void or voidable, with the exception noted in Section 17(e) below.

c) <u>Excluded Claims</u>. The following claims and disputes are not subject to arbitration under this Arbitration Agreement: (i) applications for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims arising under, relating to or in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which will be determined in accordance with the claims and dispute resolution

procedures set forth in the applicable ERISA plan documents, (iii) claims for workers' compensation benefits (however, retaliation and discrimination claims arising out of or relating to claims for workers' compensation benefits are covered under this Agreement), (iv) claims for unemployment compensation benefits, and (v) disputes that may not be subject to pre-dispute arbitration as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statutes. Regardless of any other terms of this Arbitration Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to adjudicate the claim notwithstanding the existence of an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Arbitration Agreement will be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration. The Company will not retaliate against Associate for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

d) <u>Further Exclusion</u>. This Arbitration Agreement does not apply to any lawsuits between Associate and the Company already pending in court on the date Associate executes this Agreement, including any class, collective, or representative action, for which Associate is already a member or potential member of the class, collective, or representative action ("Pending Claims"). However, if Associate previously signed (and did not opt out of) an agreement to arbitrate claims with the Company prior to commencement of a Pending Claim and that Pending Claim was covered by the previous agreement to arbitrate, that previous agreement to arbitrate would continue to apply to the Pending Claim, even if Associate opts out pursuant to Section 17(h) below.

e) <u>Class and Representative Action Waiver</u>.

THE COMPANY AND ASSOCIATE AGREE TO BRING ANY DISPUTE IN ARBITRATION ON AN INDIVIDUAL BASIS ONLY, ACCORDINGLY:

THE COMPANY AND ASSOCIATE HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY SUCH CLAIM ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement, the preceding sentence will not be severable from this Arbitration Agreement in any instance in which the Covered Claim is brought as a class and/or collective action. To the extent the Class Action Waiver is determined to be invalid, unenforceable, or void, the class action must proceed in a court of law and not in arbitration.

THE COMPANY AND ASSOCIATE ALSO HEREBY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE UNDER ANY SUCH CLAIM ("Representative Action Waiver"). The Representative Action Waiver does not apply to any claim Associate brings in arbitration as a private attorney general solely on Associate's own behalf and not on behalf of or regarding others. The Representative Action Waiver will be severable from this Agreement in any case in which there is a final judicial determination that the Representative Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances and where the claim is brought as a private attorney general, such private attorney general claim must be litigated in a civil court of competent jurisdiction, but all other provisions of this Agreement and Arbitration Agreement, including without limitation the Class Action Waiver, will continue to apply.

Notwithstanding any other clause of language contained in this Arbitration Agreement and/or any rules or procedures that might otherwise be applicable by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that this Class Action Waiver or Representative Action Waiver, or any portion of this Class Action Waiver or Representative Action Waiver, is unenforceable, inapplicable, unconscionable, or void or voidable, will be determined only by a court of competent jurisdiction and not by an arbitrator.

f)  Selection and Rules.  The parties will select the neutral arbitrator and/or arbitration sponsoring organization by mutual agreement. If the parties cannot mutually agree to an arbitrator and/or arbitration sponsoring organization, the arbitration will be held under the auspices of the American Arbitration Association ("AAA"), and except as provided in this Arbitration Agreement, shall be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available through the Company's Human Resources Department or via the internet at www.adr.org/employment or by using a service, such as www.google.com, to search for "AAA Employment Arbitration Rules").   To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the AAA Rules, the terms, conditions or requirements of this Arbitation Agreement shall govern.  Unless the parties jointly agree otherwise, the Arbitrator will be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction (the "Arbitrator").  Unless the parties jointly agree otherwise, the arbitration will take place in or near the city in which Associate is or was last employed by the Company. In the event the parties mutually choose a sponsoring organization, or AAA is designated, the Arbitrator will be selected as follows:  The selected organization shall furnish a list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains.  That person will be designated as the Arbitrator.  If for any reason, that person cannot serve, the selected organization will issue another list of eleven (11) arbitrators and repeat the selection process.

The Arbitrator is required to issue a written award and opinion, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction.  The arbitration will be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in federal district court, and the parties may file and the arbitrator will hear and decide at any point in the proceedings motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.  No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration or court proceeding where any party was not a named party in the arbitration, unless and except as permitted by applicable law.

g)  Remedies and Fees.  Subject to the parties' right to seek correction, modification, or vacatur under the FAA, Associate and the Company agree that the award of the arbitrator will be final and binding on the parties and that the arbitrator may award  any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement.  The Arbitration shall apply the substantive law including, but not limited to, applicale statutes of limitations (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claims(s) asserted.  The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies.  Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Company will be responsible for all arbitration filing fees, forum fees, and fees of the arbitrator.

h)  Arbitration Opt-Out.  Associate may opt-out of this Arbitration Agreement in Section 17 by submitting a signed written statement that Associate wishes to opt-out and not be subject to this Arbitration Agreement in Section 17.  In order to be effective, the written statement must include Associate's full name, address, and employee ID number, and must be submitted to **H&R Block-Legal Department, Attention: Arbitration Opt-Out, One H&R Block Way, Kansas City, Missouri 64105** within thirty (30) days of Associate's signing of this Agreement.  Associate's written opt-out of the Arbitration Agreement will override Associate's signature below regarding arbitration for purposes of Section 17, but no other provision of this Agreement or prior or future arbitration agreements between Associate and the Company.  Any associate choosing to opt-out of the Arbitration Agreement will not be subject to any adverse employment action as a consequence of that decision.

## 18. Severability.

Except as set forth in Section 17, above, the provisions of this Agreement shall be severable.  If any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision will not affect the legality, validity or enforceability of the remaining provisions hereof.  If the

Class or Representative Action Waiver set forth in Section 17(e) is determined to be invalid, unenforceable, or void with respect to any Covered Claim, the Waiver shall remain effective and enforceable with respect to all other Covered Claims.

**19. Survival; Assignability.**

Notwithstanding any language to the contrary in this Agreement, the parties agree that the covenants and agreements contained in Sections 8 through 21, including the Arbitration Agreement in Section 17, will survive the termination of this Agreement and/or the termination of Associate's employment and will, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, responsibilities, position, or title, and/or the expiration of any benefit.   This Agreement is assignable by the Company to any other party without notice to, consent by, or approval by Associate.  Associate shall not assign this Agreement.  This Agreement will inure to the benefit of the successors and assigns of the Company.

**20. Notices.**

All notices required to be given hereunder shall be in writing and will be deemed served and delivered for all purposes if delivered in person; if delivered by e-mail or fax (with confirmation of delivery); or if mailed, postage prepaid, to Associate at the above-stated address or to the Company at the principal office for the district of employment, except as noted in Section 17(h).  Any notice given by mail shall be deemed given as of the date mailed and postmarked or received by a nationally recognized overnight courier for delivery.

**21. Entire Agreement.**

The foregoing is the entire Agreement between the parties as to the terms and conditions of Associate's employment and the subject matter of each of the paragraphs and subparagraphs of this Agreement, and no amendment of this Agreement will be effective unless in writing and signed (written or electronic) by the parties or is by order of a duly-appointed arbitrator or, where permitted by Section 17, by a court of competent jurisdiction.  **Associate understands and agrees to the use of an electronic method of signature to demonstrate acceptance and agreement to the terms of this Agreement.**

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year noted below.

**By checking the sign and submit button, you are indicating your agreement to the above terms and conditions, including but not limited to the Arbitration Agreement and Class and Representative Action Waiver in Section 17. THIS EMPLOYMENT AGREEMENT CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. Checking the button will serve as your electronic signature.  Once you have checked that button, a signature date will display in this document, below.**

/s/ _Colleen Griffith_
Associate

/s/ _HRB Resources LLC_
Company

Date
Signed: _11/25/2014_